# 14-1490-cv

# United States Court of Appeals

*for the*

# Second Circuit

———————

MICHAEL G. BRAUTIGAM, an individual,

*Plaintiff-Appellant,*

– v. –

CLAES DAHLBACK, STEPHEN FRIEDMAN, JAMES A. JOHNSON,
LLOYD C. BLANKFEIN, WILLIAM W. GEORGE, GARY D. COHN,
DAVID VINIAR, GOLDMAN SACHS GROUP, INC.,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

EMERSON POYNTER LLP
830 Apollo Lane
Houston, Texas 77058
(281) 488-8854

– and –

POMERANTZ LLP
600 Third Avenue, 26th Floor
New York, New York 10016
(212) 661-1100

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT ...................................................................1

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF THE CASE......................................................................3

    A.    The Nature of the Case...................................................................3

    B.    The Course of Proceedings and Disposition Below.................................3

STATEMENT OF FACTS .........................................................................5

    A.    Introduction. ..............................................................................5

    B.    Board Involvement in the Wrongdoing.........................................7

    C.    From 2007 to 2011 the Goldman Board Defendants
        oversaw and signed Goldman's SE Form 10-K Filings and
        Annual Reports, containing misleading statements regarding
        the Company's client interests and conflicts of interests............................10

    D.    Goldman Board Defendants' actions have exposed
        the Company to losses..............................................................11

SUMMARY OF THE ARGUMENT ..............................................................12

STANDARD OF REVIEW ........................................................................13

ARGUMENT ........................................................................................13

        A.    The standards for considering whether pre-suit board
            demand is excused...................................................................13

i

I.   THE DISTRICT COURT ERRED IN CONCLUDING *RALES* APPLIED TO STATEMENTS IN GOLDMAN'S SEC FORM 10-K FILINGS AND ANNUAL REPORTS...........................................................15

   A.   Statements in SEC Form 10-K Filings and Annual Reports are board actions for purposes of considering demand futility. ........................................................................15

   B.   The District Court committed error in its application of *Loveman*, *Wood* and *Seminaris*. ...............................................16

   C.   The *Aronson* standard of demand futility applies to the Goldman Board Defendants' conscious decisions in signing false and misleading SEC Form 10-K Filings and Annual Reports..................................................19

   D.   Because false or misleading SEC Form 10-K Filings and Annual Reports violate federal securities law, demand was satisfied under *Aronson*'s "business judgment" prong....................20

II.   THE DISTRICT COURT ALSO ERRED IN FAILING TO DRAW INFERENCES FROM PLAINTIFF'S PLEADING SHOWING THE BOARD BREACHED ITS DUTY OF LOYALTY.........................................................21

   A.   Reasonable inferences support the proposition that the remaining four directors are interested. .....................................21

CONCLUSION.........................................................................25

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)..................................26

CERTIFICATE OF SERVICE ...........................................................27

# <u>TABLE OF AUTHORITIES</u>

CASES                                                                Page(s)

*Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) ....................................................13

*Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000) .....................................................13

*Chechele v. Sheetz*, 466 Fed. Appx. 39 (2nd Cir. 2012)...........................................13

*Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ....................................20

*In re Abbott Labs. Derivative S'Holders Litig.*, 325 F.3d 795
    (2001)................................................................................................ 20, 22

*In re Caremark Int'l Inc., Derivative Litig.*, 698 A.2d 959 (Del. 1996) .............5, 15

*In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117
    (D.N.J. 1999) .......................................................................................21

*Loveman v. Lauder*, 484 F.Supp.2d 259
    (S.D.N.Y. 2007) ........................................................... 15, 16, 17, 18

*Ponce v. S.E.C.*, 345 F.3d 722 (9th Cir. 2003) .........................................................11

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993)............................................. 14, 16, 18

*Richman v. Goldman Sachs Group, Inc.*, 868 F.Supp.2d 261
    (S.D.N.Y. 2012) .....................................................................................4, 11

*Seminaris v. Landa*, 662 A.2d 1350
    (Del. Ch. 1995) ........................................................... 15, 16, 17, 18

*South v. Baker*, 62 A.3d 1 (Del. Ch. 2012)..............................................................20

iii

*Stone v. Ritter*, 911 A.2d 362 (Del. 2009) ...............................................................12

*Wal-Mart Stores v. Ind. Elec. Workers Pension Trust Fund IBEW*,
    Case No. 614, 2014 Del. LEXIS 336 (Del. July 23, 2014) ...........................16

*Westmoreland Cty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719
    (7th Cir. 2013) .............................................................................................14

*Wood v. Baum*, 953 A.2d 136 (Del. 2008) ....................................................... passim

STATUTES

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 1332 ...........................................................................................................1

OTHER AUTHORITIES

17 C.F.R. § 240.12b-20 (2014) ...................................................................................20

17 C.F.R. § 240.14c-3 (2014)......................................................................................20

OMB No. 3235-0063, United States Securities and
    Exchange Commission Form 10-K Annual Report
    Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934 General Instructions, §D.2.a ...................................19

## PRELIMINARY STATEMENT

Plaintiff-Appellant Michael G. Brautigam ("Brautigam" or "Plaintiff") appeals from a final judgment entered pursuant to a decision by the United States District Court for the Southern District of New York (Crotty, J) dismissing Plaintiff's claims under Fed. R. Civ. P. 23.1. (A-165).[1]

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. (¶15).[2] Plaintiff is an Ohio resident and shareholder of nominal defendant Goldman Sachs Group, Inc. (¶17). Goldman Sachs Group, Inc., is a Delaware Corporation, based in New York, New York, and is a nominal defendant. (¶18). Seven Members of Goldman's then-fourteen-member board are named Defendants and none are residents of Ohio.

This Court has jurisdiction under 28 U.S.C. § 1291. Final judgment was entered in the District Court on March 31, 2014. (A-165).

The final judgment disposed of all Plaintiff's claims alleged on behalf of nominal defendant The Goldman Sachs Group, Inc. ("Goldman" or the Company") against all Goldman Board Defendants Lloyd C. Blankfein, Gary D. Cohn, Clase

---

[1] The Appendix will be cited as "A___."
[2] The Complaint will be cited as ¶___.

1

Dahlbäck ("Dahlbäck"), Stephen Friedman ("Friedman"), William W. George ("George"), James A. Johnson ("Johnson") and David Viniar (the "Goldman Board Defendants"). Plaintiff filed a timely Notice of Appeal on April 30, 2014. (A-166).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      In a shareholder derivative lawsuit, pre-suit demand is a futile act when a majority of a company's board of directors' decision was not the product of valid business judgment or they have a substantial likelihood of liability. The Goldman Board Defendants knew the Company was conducting a massive "tactical short" to the "structured exit" of the Company's subprime exposure, in conflict with the Company's clients. With this knowledge they signed Goldman's SEC Form 10-K Filings and Annual Report, containing false and misleading statements regarding "potential conflicts of interest." Did the District Court err in refusing to find a well-plead conscious decision by the Goldman Board Defendants in these circumstances?

## STATEMENT OF THE CASE

### A.    The Nature of the Case

This is a shareholder derivative lawsuit brought on behalf of Goldman alleging that the Goldman Board Defendants breached their fiduciary duty of loyalty by knowing the Mortgage Department's "tactical short" to the Company's "structured exit" of subprime mortgage exposures put the Company in conflict with its clients, and then by signing false and misleading statements in Goldman's SEC Form 10-K Filings and Annual Reports regarding existing conflicts of interest.

### B.    The Course of Proceedings and Disposition Below

Plaintiff commenced this litigation by filing the Complaint on February 1, 2013. (A-5). Plaintiff brought this derivative lawsuit as a shareholder of Goldman, to provide Goldman a remedy for breaches of fiduciary duties by the seven Goldman Board Defendants. (A-9—72). Plaintiff alleged the Goldman Board Defendants breached their duties of loyalty by acting intentionally for a purpose other than that of advancing the best interests of the Company and by intentionally violating positive law. (¶¶139—147). When Brautigam brought his lawsuit, Goldman had a thirteen-member board. (¶ 127). Brautigam made no pre-suit demand on Goldman's Board. (¶ 128). Brautigam did not make this demand because it would have been a futile act, for the seven Goldman Board Defendants, who constituted a majority of Goldman's thirteen-member board. (¶ 128).

On May 20, 2013, the Seven Board Defendants moved to dismiss the Complaint. (A-6–7). The Goldman Board Defendants moved to dismiss the Complaint on two grounds: (i) Brautigam was barred by collateral estoppel and *res judicata* from bringing the claims, based on a prior shareholder derivative suit he brought and another Delaware shareholder derivative suit; and (ii) he had not sufficiently alleged demand would be a futile act. (A-148).

On March 26, 2014, the District Court dismissed the Complaint. (A-7). The District Court held that collateral estoppel or *res judicata* were not a bar to the suit because the Delaware Suit was not focused on the "alleged corporate misstatements in Goldman's 10-Ks and Annual Reports" and Brautigam's prior shareholder derivative suit involved a different transaction. (A-154—157). The District Court dismissed the Complaint on demand futility grounds. (A-148). Applying Delaware law, the District Court correctly found three Goldman Board Defendants (Blankfein, Cohn and Viniar)[3] would be disqualified for considering a demand. (A-160). But, the District Court found the Plaintiff did not sufficiently allege that the other four

---

[3]      Three of the Goldman Board Defendants —Blankfein, Viniar, and Cohn—are Defendants in related class action securities fraud litigation, *Richman v. Goldman Sachs Group, Inc., et al.*, No. 10-Civ.3461 (PAC)(S.D.N.Y.)("*Richman*") also pending before the District Court.  The District Court denied the defendants' motion to dismiss that action, holding disclosures in Goldman's SEC Form 10-K concerning Goldman's business practices and conflicts of interest were actionable as materially misleading. *Richman v. Goldman Sachs Group, Inc.*, 868 F.Supp.2d 261 (S.D.N.Y. 2012).

4

Goldman Board Defendants (Dahlbäck, Friedman, George and Johnson) were disqualified from considering the demand. (A-160—162).

The District Court held that Plaintiff did not challenge any specific board action, and the claims against the remaining four Goldman Board Defendants (Dahlbäck, Friedman, George and Johnson) were oversight claims under *In re Caremark Int'l Inc., Derivative Litig.*, 698 A.2d 959 (Del. 1996). The District Court held that Plaintiff had failed to allege these four Goldman Board Defendants consciously failed to monitor or oversee Goldman's operations. (A-162—163). The District Court concluded, "[b]ecause Plaintiff has failed to plead particularized facts that create a reasonable doubt that a majority of Goldman's Board of Directors could have exercised disinterested and independent business judgment in considering demand, Plaintiff's failure to make demand is not excused." (A-164). On March 31, 2014, the Clerk entered the Court's Judgment. (A-7). Plaintiff timely filed his Notice of Appeal on April 30, 2014. (A-8).

## STATEMENT OF FACTS

### A. Introduction.

This shareholder derivative lawsuit arises out of the tension between: (i) the Goldman Board Defendants' decision to conduct a tactical "structured exit" from the Company's subprime mortgage-related assets; and (ii) the Goldman Board Defendants' publicly-filed statements regarding the Company's legal compliance

5

and "potential" conflicts of interest. The "structured exit" included three low-quality deals—totaling $3.505 billion—that Goldman packaged and sold from late 2006 to March 2007 (HUDSON MEZANNINE FUNDING 2006-1 ("HUDSON")($2.2 billion), ANDERSON MEZANNINE FUNDING 2006-1 ("ANDERSON")($305 million) & TIMEBERWOLF I ("TIMBERWOLF")($1 billion). (¶¶ 8—10, 37, 41, 59—63, 64—66, 68. 77). These deals were part of Goldman's strategy to reduce its risk relating to subprime, mortgage-related assets, once Goldman learned the market was in serious trouble. (¶ 5).

Secretly, Goldman tactically bet against their clients on these deals, by being the largest short investor. (¶ 37, 64, 68). For HUDSON, Goldman purchased insurance that would pay off when the underlying assets of the deal failed. (¶ 37). For ANDERSON, the deal depended on subprime loans originated by risky lenders and Goldman had 40% of the short side. (¶ 60 – 61, 68). TIMBERWOLF was sold to non-traditional clients at prices exceeding Goldman's internal values and Goldman had 36% of the short side. (¶ 64, 85).

These conflicts of interest reached the core of Goldman's risk management strategy for the looming housing crisis, and was only fully revealed when the United States Permanent Subcommittee for Investigations (the "Subcommittee") published its April 13, 2011 report *Wall Street and the Financial Crisis*. (¶1—2).

### B. Board Involvement in the Wrongdoing.

Three Goldman Board Defendants were more directly involved in the wrongdoing surrounding HUDSON, ANDERSON and TIMBERWOLF.[4] The District Court found demand was futile as to these three Defendants.

By September 9, 2006, the other four Goldman Board Defendants (Dahlbäck, Friedman, George, and Johnson) received a presentation regarding mortgage exposures and the specifics surrounding the impact that the market disruption may have on Goldman's business. (¶100.). *See also* (A-88). This same day, the head of Goldman's Mortgage Department notified Blankfein, Cohn and Viniar that the Department was trying to jettison its exposures to mortgage-related investments and securitize mortgages for sales to potential clients. (¶ 33). On September 10, 2006, the head of Goldman's Mortgage Department notified Blankfein, Cohn and Viniar of work on what would become HUDSON. (¶ 35).

On March 26, 2007, the seven Goldman Board Defendants received another Mortgage Department presentation "*Subprime Mortgage Business*" discussing ongoing deterioration in mortgage markets and stating "***GS reverses long market positions through purchases of single name CDS[5] and reductions of ABX[6]***" and

---

[4]      *See* FN 3, *supra.*

[5]      CDS stands for ("Credit Default Swap") functioned like a credit insurance agreement, where the investors would anticipate that the assets would not experience a negative credit event. (¶ 8).

[6]      The ABX Index (asset backed security index) tracked the performance of- and its value depended on- twenty subprime residential mortgage backed securities. (¶ 3).

the Company's long and short positions. (¶¶72, 73). *See also* (A-88). One week before the board meeting, ANDERSON closed. (¶69.). One day after the board meeting TIMBERWOLF closed. (¶ 77).

Later, on September 17, 2007, the seven Goldman Board Defendants received a presentation "*How Missed Signs Contributed to a Mortgage Meltdown*" that included the slide "**Q2 2007 and Q3 2007 – "Positioned business tactically— "[s]horted synthetics," "[s]horted CDOs[7] and RMBS[8]," "[r]educed long inventory**."" (¶95). *See also* (A-109). After receiving these presentations, all seven Goldman Board Defendants knew Goldman was betting against the Company's clients.

Beyond these presentations, Plaintiff alleged additional facts showing Goldman Board Defendants Dahlbäck, Friedman, George and Johnson's knowledge of conflicts of interest. Goldman Board Defendants Blankfein, Cohn and Vinar attended weekly meetings concerning the Company's efforts to reduce its exposures, and were continually apprised of the Mortgage Department's activities. (¶¶ 4, 6d., and 100). HUDSON, ANDERSON and TIMBERWOLF had to be approved by up to seven Goldman committees. (¶ 36). Goldman Board Defendants Dahlbäck,

---

[7]       "CDOs" stands for "Collateralized Debt Obligation" were securities backed by a portfolio of securitized loans. (¶ 8).
[8]       "RMBS" means "Residential Mortgage Backed Securities" and involved bundling a number of home loans into a single pool, paying money to investors in different tranches. (¶ 2).

8

Friedman, George and Johnson met within a week of ANDERSON's closing and were briefed on the Company's subprime mortgage business. (¶69). Goldman Board Defendants Dahlbäck, Friedman, George and Johnson were members of the Board's Audit Committee, which met ten times in 2007, including five executive sessions and five sessions with management and the Company's Director of Internal Audit. (¶¶ 22—25). Under Goldman's Code of Ethics Goldman Board Defendants Blankfien, Cohn and Viniar were required to advise Goldman Board Defendants Dahlbäck, Friedman, George and Johnson about material information affecting risk reduction activities. (¶19—21). Talking points for presentations to federal regulators showed there were: (i) "several presentations to the Board regarding mortgage exposures," [the September 2006, March 2007, and September 2007 presentations with another to follow], and (ii) the board was given Quarterly Presentations "to ensure that [the Board of Directors], understood the specifics related to valuation issues, conduits, structured investment vehicles, [and] leveraged lending." (¶100). Plaintiff has alleged particularized facts that individuals with reporting relationships to the board with intimate knowledge concerning the deals and the conflict of interest.

9

**C.     From 2007 to 2011 the Goldman Board Defendants oversaw and signed Goldman's SEC Form 10-K Filings and Annual Reports, containing misleading statements regarding the Company's conflicts of interests with its clients.**

In the face of knowledge they were betting against Goldman's clients, beginning in January 28, 2008, the seven Goldman Board Defendants (a majority of Goldman's board) oversaw and signed the Company's Form SEC 10-K Filing, stating:

> "a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses[]";

> "[o]ur reputation is one of our most important assets[]";

> "we increasingly have to address potential conflicts of interest, including situations where…our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client[]";

> "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest….[]" (¶113.)

The seven Goldman Board Defendants also published and distributed the Company's Annual Reports to shareholders for the years 2007 through 2010 stating:

> "[o]ur clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow[]";

> "[o]ur assets are our people, capital and reputation[]";

> "[w]e are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us[]";

10

"[i]ntegrity and honesty are at the heart of our business." (¶114.).

The Goldman Board Defendants Dahlbäck, Freidman, George and Johnson served on the Board's Audit Committee and had the responsibility for oversight of the Company's compliance with legal and regulatory requirements, including the issuance of financial statements. (¶135). The seven Goldman Board Defendants were also required to comply with the Company's Code of Ethics, which required full and accurate information in SEC filings. (¶135). Filing reports with the SEC is one of the principal methods of financial reporting and is required by the Securities and Exchange Act of 1934 ("the Exchange Act") for public U.S. companies. *See Ponce v. S.E.C.*, 345 F.3d 722, 734-36 (9th Cir. 2003) (discussing the Exchange Act's requirement that companies file "quarterly reports that are not misleading.").

**D.     Goldman Board Defendants' Actions have exposed the Company to losses.**

Because of Goldman Board Defendants' actions, the Company's reputation has suffered, it has incurred significant expenses from the Subcommittee and other's investigations, its market capitalization eroded, and it faces financial liability *for Richman* and individual civil fraud actions brought by its clients. *Dodona I, LLC v. Goldman Sachs & Co., et al*., No. 10-Civ-7497 (VM)(S.D.N.Y.) and *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, Index No. 652996/2011 (N.Y.Supr.Ct.). (¶ 14).

## SUMMARY OF THE ARGUMENT

Plaintiff has adequately pleaded that demand is futile under Delaware substantive law and should be allowed to proceed with the derivative claims. Plaintiff alleged with specificity facts showing that, for years, the Goldman Board Defendants were knowingly complicit in the Company's unlawful conduct. As particularly alleged in the Complaint, a reasonable inference can be drawn that Goldman Board Defendants Dahlbäck, Friedman, George, and Johnson oversaw and monitored the Company's tactical short "structured exit," putting the Company in conflict with its clients, before they took the action of signing misleading statements in Goldman's SEC Form 10-K SEC Filings and Annual Reports.

The Goldman Board Defendants' decisions allowing the company to include disclaimers about potential conflicts in their SEC Form 10-K Filings and Annual Reports when the conflicts had already materialized or had previously occurred, caused Goldman to break federal securities law, and are not protected by the business judgment rule. These actions also subject these Goldman Board Defendants to a "substantial likelihood of liability" such that they cannot objectively consider whether to cause the Company to sue them. These facts also support a claim for breach of duty of good faith. *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2009)("A failure to act in good faith may be shown, for instance, where the fiduciary

12

intentionally acts with a purpose other than that of advancing the best interest of the corporation, where the intent to violate applicable positive law.").

## STANDARD OF REVIEW

This Court review granting a Motion to Dismiss is *de novo*. *Chechele v. Sheetz*, 466 Fed. Appx. 39 (2nd Cir. 2012).

## ARGUMENT

**A.  The standards for considering whether pre-suit board demand is excused.**

When considering a motion to dismiss for demand futility, a Court must draw all reasonable inferences in plaintiff's favor, and consider whether the plaintiff's Complaint raises a "reasonable doubt" concerning the board's ability to address demand in a disinterested and independent manner. *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000) (holding that the demand futility test "allow[s] a plaintiff to proceed with discovery and trial if the plaintiff . . . can articulate a reasonable basis to be entrusted with a claim that belongs to the corporation.").

The test for demand futility when a decision of the board of directors is challenged under *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) is "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." To satisfy the *Aronson* test, "[t]he totality of the complaint's allegations need only support a

13

reasonable doubt of business judgment protection, not a 'judicial finding that the directors' actions are not protected by the business judgment rule.'" *Westmoreland Cty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 726 (7th Cir. 2013).

When no decision is challenged the test for demand futility under *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993) is "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Moreover, a decision not to act is just as much of a decision as a decision to act. *See Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011).

Here, the District Court incorrectly decided *Rales* was the applicable test.

The statements in Goldman's SEC Form 10-K Filings and Annual Reports were conscious **_decisions_** by the Goldman Board Defendants, properly analyzed under the *Aronson* standard. If the District Court properly applied the *Aronson* standard, the pleaded facts demonstrated demand on the other four Goldman Board Defendants was futile because the decision to include misleading statements in SEC Form 10-K Filings and Annual Reports is not a product of "business judgment," and would make them interested because they face a substantial likelihood of liability. Thus, demand would be futile to a majority of Goldman's Board.

I.    **THE DISTRICT COURT ERRED IN CONCLUDING *RALES* APPLIED TO STATEMENTS IN GOLDMAN'S SEC FORM 10-K FILINGS AND ANNUAL REPORTS.**

A.    **Statements in SEC Form 10-K Filings and Annual Reports are board actions for purposes of considering demand futility.**

From 2007 to 2011 the Goldman Board Defendants (through its SEC Form 10-K Filings and Annual Reports) affirmatively represented "our clients' interests ***always*** come first" (Annual Report) and "we have extensive procedures and controls . . . designed to ***identify*** and ***address*** conflicts of interest." (A-135—146).

The District Court held allegations that "directors merely allowed or "caus[ed] to be signed" certain corporate misstatements did not provide sufficient grounds to apply *Aronson*. (A-159—161)(c*iting Loveman v. Lauder*, 484 F.Supp.2d 259, 266, 270 (S.D.N.Y. 2007), *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008), *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995)). The District Court also found that Plaintiff did not "sufficiently allege that the majority of the directors were interested or dependent, or that the director defendants had knowledge that any of the disclosures or omissions were false or misleading." (A-159). The Court held that the "outside directors risk of personal liability . . . is properly classified as a *Caremark* claim." (A – 161)(*citing In re Caremark Int'l Inc., Derivative Litig.*, 698 A.2d 959).

The District Court misapplied these cases because Plaintiff sufficiently alleged the Goldman Board Defendants' conscious decision about what information to include in the SEC Form 10-K Filings and Annual Reports. The Board's conscious

15

decision flowed from: (i) board presentations; (ii) their duties and responsibilities; (iii) the direct knowledge of their fellow directors; (iv) reasonable inferences from officer-level communications; and (v) the gravity of the situation. *See Wal-Mart Stores v. Ind. Elec. Workers Pension Trust Fund IBEW*, Case No. 614, 2014 Del. LEXIS 336, * 19 (Del. July 23, 2014)(noting a shareholder derivative plaintiff may establish director knowledge by establishing officers were in a reporting relationship to directors, officers did in fact report to specific directors, and those officers received key information).

**B.    The District Court committed error in its application of *Loveman*, *Wood* and *Seminaris*.**

The District Court found "*Rales* provides the appropriate test for this derivative suit" because "Plaintiff does not challenge any specific board action that approved or ratified the [] alleged wrongdoing." (A- 159). The three cases the District Court relied on for this proposition are: *Loveman*, *Wood* and *Seminaris*. (A-159—161).

*Loveman* involved allegations Estee Lauder's board breached their duty of loyalty when they issued false press releases to inflate the stock's value, conduct insider trading, and deceive the public concerning the company's finances. In *Loveman*, the court decided the complaint challenged two theories, (i) a board's decision to purchase stock at an inflated price, and (ii) the board's inaction and failure to oversee the corporation's activities. *Loveman*, 484 F.Supp.2d at 263.

16

*Loveman* analyzed statements in a company's Form 8-K under Aronson's second, "business judgment prong." *See id.* at 269. In a footnote, the Court noted the company "was not required . . . to disclose the steps taken by the board in determining whether to approve the transaction . . . its failure to do so would not raise an inference that the board did not exercise sound business judgment in approving the repurchase of Mr. Lauder's shares, even assuming that plaintiff had incorporated the Form 8-K in the complaint." *See id.* at 270 n. 57.

*Wood* involved allegations against a board of a municipal mortgage company, arguing, among other things, the board improperly entered into transactions. In *Wood*, the Delaware Supreme Court held the complaint did not sufficiently allege facts that would show a board's constructive knowledge of the wrongfulness of a board's action. *Wood*, 953 A.2d at 142. The court held "the Board's execution of [the Company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality." *See id.* at 143. The Delaware Supreme Court cited *Aronson* as the proper test for execution of financial reports. *See id.* at 143 n. 18.

*Seminaris* involved a medical device company. The CEO of the company made several public statements giving positive impressions of the company's earnings, and, later, the company disclosed its earnings were overstated and the CEO had resigned. *Seminaris*, 662 A.2d 1353. The Board appointed a special committee

17

and noted a pending SEC investigation, in its public filings. *Id.* After deciding the special committee did not mean the board conceded demand futility, the Court considered whether to apply *Aronson* or *Rales*. *See id.* at 1355. In *Seminaris*, the court noted "the only particular allegations that support plaintiff's conspiracy theory are that three of the directors . . . signed a misleading 10-K and a misleading registration statement." *See id.* The plaintiff alleged the board failed to prevent the CEO from misrepresenting the corporation's financial condition. *See id.* at 1354. The Court considered the allegations, and stated, without citation, the plaintiff "alleges that certain board members signed misleading statements on behalf of the corporation, and that all of the defendants conspired with the CEO to inflate the stock's value. . . but challenged no specific board action that approved or ratified these alleged wrongdoings." *See id. at 1355.*

The District Court erred in holding these cases stood for a blanket proposition that board statements in executed financial statements are an insufficient grounds to apply *Aronson*. In fact, *Loveman* and *Wood* applied *Aronson* to board statements in executed financial statements. And to the extent *Seminaris* applied *Rales*, it was because of the absence of board link to the misleading statements. However, here Plaintiff pleaded a direct link between the Goldman Board Defendants': (i) knowledge of the Company's "tactical short" to its "structured exit" of its mortgage exposure and (ii) their decision to omit this information and sign and file a false and

18

misleading SEC Form 10-K. Thus, the District Court committed reversible error because the Goldman Board Defendants' signature on a misleading SEC Form 10-K Filing and Annual report was their ***action*** and ***decision***, subject to their business judgment under *Aronson.*

**C.    The *Aronson* standard of demand futility applies to the Goldman Board Defendants' Conscious decisions in signing false and misleading SEC Form 10-K Filings and Annual Reports.**

*Aronson* applies to this lawsuit because the challenged conduct involves the Goldman Board Defendants' decision to cause Goldman to file a false and misleading SEC Form 10-K in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") which they signed with knowledge of the Company's tactical short on assets totaling $3.505 billion. As Plaintiff has pled, Goldman Board Defendants were responsible for its financial reporting and for monitoring the Company's compliance with federal securities laws. (¶135). Goldman Board Defendants Dahlbäck, Freidman, George and Johnson served on the Board's Audit Committee, and had the specific responsibility for oversight of the Company's compliance with legal and regulatory requirements, including the issuance of financial statements. *Id.* A majority of a company's board must sign an SEC Form 10-K. *See* OMB No. 3235-0063, United States Securities and Exchange Commission Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 General Instructions, §D.2.a. Also, Rule 12b-20 of

19

the Exchange Act requires an SEC Form 10-K to include "material information, if any, as may be necessary to make required statements, in light of the circumstances under which they are made not misleading." *See* 17 C.F.R. § 240.12b-20 (2014). A company's annual report must be sent to its shareholders when it holds an annual meeting to elect directors. *See* 17 C.F.R. § 240.14c-3 (2014).

The decision to sign and file false SEC Form 10-K Filings and Annual Reports rested with the Goldman Board Defendants. Also, the allegations support the reasonable inference that Goldman Board Defendants exercised control over the Report and were complicit in its filing despite knowing it was false. Such a decision is reviewable under *Aronson*. *See In re Abbott Labs. Derivative S'Holders Litig.*, 325 F.3d 795, 806-07 (2001); *see also South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012)("A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act.").

**D.     Because false or misleading SEC Form 10-K Filings and Annual Reports violate federal securities law, demand was satisfied under *Aronson*'s "business judgment" prong.**

Actions that violate positive law fall outside the protection of the business judgment rule because Delaware law does not countenance directors operating companies in an illegal manner. *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007)("Although directors have wide authority to take lawful action on behalf of the

20

corporation, they have no authority knowingly to cause the corporation to become a rouge, exposing the corporation to penalties from criminal and civil regulators."). The Goldman Board Defendants' decision to make illegal statements in violation of the Exchange Act is not protected by the business judgment rule. *See In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 129 (D.N.J. 1999)(applying *Aronson* and finding demand futile where the plaintiff pleaded, *inter alia*, that the director defendants approved of and published false statements).

Therefore, demand is excused under *Aronson*. The allegations supported the reasonable inference that Goldman's Board exercised control over its SEC Form 10-K Filings and Annual Reports, but were complicit in its filing despite knowing it was false and misleading. That should have ended the District Court's inquiry and excused demand.

## II. THE DISTRICT COURT ALSO ERRED IN FAILING TO DRAW INFERENCES FROM PLAINTIFF'S PLEADING SHOWING THE BOARD BREACHED ITS DUTY OF LOYALTY.

### A. Reasonable inferences support the proposition that the remaining four directors are interested.

Under the second prong of *Aronson*, a reasonable inference could also be drawn from the pleadings that Goldman Director Defendants Dahlbäck, Friedman, George, and Johnson had knowledge of the Company's "structured exit," and knew the Company was betting against its own clients, before they signed misleading statements in Goldman's SEC Form 10-K Filings and Annual Reports.

21

Deliberate conduct aimed at breaking the law or fostering illegal conduct is a breach of the fiduciary duty of loyalty, and well-pled allegations that a majority of the Board engaged in such conduct excuses demand. *Wood*, 953 A.2d at 142. Because these seven Goldman Board Defendants constituted a majority of Goldman's Board when the Complaint was filed, demand is excused. *See id*.

The District Court should have reasonably inferred that the seven Goldman Board Defendants did not act in good faith to ensure the Company's compliance with law because, during a critical time in the Company and United States history, they tactically bet against their clients at the direction of the CEO and two other prominent Board members.

When corporate governance and reporting systems are in place, absent allegations to the contrary, there is a legal presumption these systems were followed and that directors knew of problems pertaining to material aspects of a company's business. *See, In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d at 808-9. Besides the three pleaded Board meetings at which mortgage problems were discussed, senior executives told the SEC and other regulators in November 2007 that the mortgage book was discussed at every meeting of the Firm Wide Risk Committee throughout 2007, there was constant communication with the Company's most senior executives about the Mortgage Department's revenues and controls, there was another board presentation specific to mortgage structured products and valuation

22

for the Board scheduled for later that month, and that decisions about short mortgage positions were taken with full knowledge of the Company's most senior executives. (¶ 100.)

On top of these facts, Dahlbäck, Friedman, George, and Johnson were members of all of the Board's standing committees. (¶¶22—25.) As Audit Committee members, they oversaw, monitored, and discussed legal and regulatory requirements and the Company's management of, *inter alia*, market and credit risks posed by the Company's subprime mortgage exposures and compliance with Company, legal and regulatory requirements. (¶27, 135). Each of these Defendants served on all of the Board's standing committees tasked with assisting the Board, including its Audit Committee and its Risk Committee. (¶27, 135). The Audit Committee met ten times during 2007, including five executive sessions and five private sessions with management and the Director of Internal Audit, and Dahlbäck, Friedman, George, and Johnson had at least those ten occasions to review among themselves and with legal and compliance officers material credit and financial risks inherent in Mortgage Department positions and activities and the related Company, legal and regulatory compliance issues. (¶¶22—25.) This follows from the three pleaded presentations, the November 2007 Trilateral Commission document, and their heightened duties under the committee charter to assist the Board in its oversight. The Company's Code of Business Conduct and Ethics applicable to

23

directors and employees ensured that outside directors Dahlbäck, Friedman, George, and Johnson were informed of material facts about the Company, including the Mortgage Department structured exit activities. (¶¶27, 135). The provision prohibiting directors and employees "from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the firm to others, whether within or outside the firm" ensured that Blankfein, Cohn, Viniar, employee director Winkelried, Management Committee members (including Montag), Mortgage Department head Sparks and his predecessor Sobel, and others communicated material facts concerning Goldman's massive "tactical short" to the "structured exit" and its conflicts of interest to the outside directors. (¶¶ 27, 135).

Considering the Goldman Board Defendant's conscious action in signing the SEC Form 10-K Filings and Annual Reports, and their positions and responsibilities the District Court committed error in dismissing the case.

The cases requiring specified allegations regarding board involvement in misstatements and omissions only do so as part of establishing the Board's knowledge of the falsity of those misstatements and omissions. *See, e.g., Wood*, 953 A.2d at 142 (noting that "Board approval . . . without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors"). Where, as here, Plaintiff specifically alleged that a majority of the Goldman Board

24

Defendants knew of the falsity of the misstatements and omissions in the SEC Form

10-K Filings and Annual Reports, no further allegations are required.

## CONCLUSION

For the reasons set forth above, the Judgment of the District Court should be

reversed.

Dated: August 14, 2014     Respectfully Submitted,
   New York, New York

**POMERANTZ, LLP**

By  /s/ Jeremy A. Lieberman
Jeremy A. Lieberman
Pomerantz, LLP
600 Third Avenue
New York, NY 10013
(212) 661-1100

John G. Emerson
Emerson Poynter LLP
830 Apollo Lane
Houston, TX 77058
(281) 488-8854

William T. Crowder
Emerson Poynter LLP
1301 Scott Street
Little Rock, AR 72202
(501) 907-2555

*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)</u>

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the attached brief is proportionally spaced, has a typeface (New Times Roman) of 14 points, and contains 13,301 words (excluding, as permitted by Fed. R. App. P. 32(a)(7)(B), the corporate disclosure statement, table of contents, table of authorities, and certificate of compliance), as counted by the Microsoft Word processing system used to produce this brief.

Dated: August 14, 2014

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman

26

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

|  |  |
|---|---|
| MICHAEL G. BRAUTIGAM, an individual, | x<br>:<br>:<br>: |
| Plaintiff, | : |
| vs. | :<br>: |
| LLOYD C. BLANKFEIN, GARY D. COHN, DAVID VINIAR, CLAES DAHLBÄCK,STEPHEN FRIEDMAN, WILLIAM W. GEORGE, JAMES A. JOHNSON, | : No.: 14-1490<br>:<br>:<br>:<br>:<br>: |
| Defendants, | :<br>: |
| and, | :<br>: |
| GOLDMAN SACHS GROUP, INC., | :<br>: |
| Nominal Defendant. | :<br>x |

## CERTIFICATE OF SERVICE

I, Jeremy A. Lieberman, do hereby certify that, on August 14, 2014, I caused a true and correct copy of the Brief of Appellant to be served by overnight mail postage-prepaid on the following:

SULLIVAN & CROMWELL, LLP
Benjamin Robert Walker, David Maxwell Rein, Richard Howard Klapper
Robert Joseph Giuffra, Jr, Theodore Edelman
125 Broad Street, New York, NY 10004


Dated: August 14, 2014

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman

27