# 14-1490-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

MICHAEL G. BRAUTIGAM, An individual,

*Plaintiff-Appellant,*

—against—

CLAES DAHLBACK, STEPHEN FRIEDMAN, JAMES A. JOHNSON,
LLOYD C. BLANKFEIN, WILLIAM W. GEORGE, GARY D. COHN,
DAVID VINIAR, GOLDMAN SACHS GROUP, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

RICHARD H. KLAPPER
THEODORE EDELMAN
ROBERT J. GIUFFRA, JR.
DAVID M.J. REIN
BENJAMIN R. WALKER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendants-Appellees*

September 15, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Nominal-Defendant-Appellee The Goldman Sachs Group, Inc. ("Goldman Sachs" or the "Firm") states that it has no parent corporation, and, to the best of its knowledge, no publicly held company owns 10% or more of its common stock.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE ISSUES PRESENTED ................................. 1

STATEMENT OF THE CASE ............................................................ 2

STATEMENT OF FACTS ................................................................. 6

    A.    The Parties ............................................................................ 6

    B.    Goldman Sachs' Disclosures to Sophisticated CDO Investors ............ 8

    C.    Goldman Sachs' Public Disclosures ................................... 10

    D.    Prior Mortgage-Related Putative Derivative Suits Against the Board ............ 13

    E.    The District Court's Dismissal of Plaintiff's Complaint ................... 14

SUMMARY OF ARGUMENT .......................................................... 16

STANDARD OF REVIEW ............................................................... 18

ARGUMENT .................................................................................... 19

I.    THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFF'S FAILURE TO MAKE A DEMAND ON THE GOLDMAN SACHS BOARD IS NOT EXCUSED. ................................... 19

    A.    The District Court Correctly Held that the *Rales* Test Applies Here. ............ 21

    B.    The District Court Correctly Ruled That Demand Was Not Excused Under *Rales* Because the Complaint Did Not Give Rise To a "Substantial Likelihood" of Director Liability. ................. 26

    C.    The District Court Correctly Held That the Complaint Also Fails To Plead Demand Futility Under *Aronson*. ................. 36

II.    UNDER GOVERNING SECOND CIRCUIT LAW, THE
       ALLEGED MISSTATEMENTS ON WHICH PLAINTIFF
       PREDICATES HIS DERIVATIVE CLAIMS ARE NOT
       ACTIONABLE...................................................................................39

CONCLUSION ...................................................................................46

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*ACA Financial Guaranty Corp.* v. *Goldman, Sachs & Co.*,
   106 A.D.3d 494 (N.Y. App. Div. 2013) ..........................................................29

*Aronson* v. *Lewis*,
   473 A.2d 805 (Del. 1984) ...................................................................*passim*

*In re Bank of New York Mellon Corp. Forex Transactions Litigation*,
   991 F. Supp. 2d 457 (S.D.N.Y. 2013) ...............................................35

*Basis Yield Alpha Fund Master* v. *Morgan Stanley*,
   2013 WL 942359 (N.Y. Sup. Ct. Feb. 28, 2013)...............................29

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ...................................................*passim*

*Braddock* v. *Zimmerman*,
   906 A.2d 776 (Del. 2006) ................................................................20

*Brehm* v. *Eisner*,
   746 A.2d 244 (Del. 2000) ..........................................................19, 39

*In re Caremark International Inc. Derivative Litigation*,
   698 A.2d 959 (Del. Ch. 1996) ....................................................*passim*

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014), *reconsideration denied* (June 13, 2013) .......*passim*

*In re Citigroup Inc. Shareholder Derivative Litigation*,
   964 A.2d 106 (Del. Ch. 2009) .......................................29, 30, 35, 36

*City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ....................................................*passim*

*Desimone* v. *Barrows*,
   924 A.2d 908 (Del. Ch. 2007) ........................................................34

*Page(s)*

*DiRienzo* v. *Lichtenstein*,
    2013 WL 5503034 (Del. Ch. Sept. 30, 2013)......................................................36

*In re Dow Chemical Co. Derivative Litigation*,
    2010 Del. Ch. LEXIS 2 (Del. Ch. Jan. 11, 2010)..............................................36

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan*
    *Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .....................................................................*passim*

*In re Goldman Sachs Group, Inc. Derivative Litigation*,
    1:10-cv-03614-PAC (S.D.N.Y.) ........................................................................13

*In re The Goldman Sachs Group, Inc. Derivative Litigation*,
    No. 650318/2010 (N.Y. Sup. Ct. N.Y. County) ................................................13

*In re Goldman Sachs Group, Inc. Shareholder Litigation*,
    2011 WL 4826104 (Del. Ch. Oct. 12, 2011), *aff'd sub nom.*, *SE. PA*
    *Transp. Auth.* v. *Blankfein*, 44 A.3d 922, 2012 WL 1563893 (Del. May 3,
    2012) (unpublished disposition) ...............................................................*passim*

*In re The Goldman Sachs Group*, *Inc. Shareholder Litigation*,
    C.A. No. 5215-VCG (Del. Ch.) .......................................................................12

*In re Goldman Sachs Group, Inc. Securities Litigation*,
    2014 WL 2815571 (S.D.N.Y. June 23, 2014) ............................................16, 45

*In re Goldman Sachs Mortgage Servicing Shareholder Derivative Ligitation*,
    2012 WL 3293506 (S.D.N.Y. Aug. 14, 2012)............................................*passim*

*Grimes* v. *Donald*,
    673 A.2d 1207 (Del. 1996) ...............................................................................19

*Guttman* v. *Huang*,
    823 A.2d 492 (Del. Ch. 2003) .....................................................................22, 26

*Halebian* v. *Berv*,
    590 F.3d 195 (2d Cir. 2009) ..............................................................................18

*Highland Legacy Ltd.* v. *Singer*,
    2006 WL 741939 (Del. Ch. Mar. 17, 2006) .....................................................37

*Page(s)*

*In re ITT Corp. Derivative Litigation,*
    588 F. Supp. 2d 502 (S.D.N.Y. 2008) ...............................................34

*In re JPMorgan Chase & Co. Derivative Litigation,*
    2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014) ....................................34

*Kamen* v. *Kemper Financial Services, Inc.,*
    500 U.S. 90 (1991)..............................................................................20

*Kautz* v. *Sugarman,*
    456 F. App'x 16 (2d Cir. 2011) ........................................................18

*Landesbank Baden-Württemberg* v. *Goldman, Sachs & Co.,*
    821 F. Supp. 2d 616 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679 (2d Cir.
    2012) ...................................................................................................29

*Lapin* v. *Goldman Sachs Group, Inc.,*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...............................................44

*Loreley Financing (Jersey) No. 4 Ltd.* v. *UBS Ltd.,*
    963 N.Y.S.2d 566 (N.Y. Sup. Ct. 2013)............................................29

*Louisiana Municipal Police Employees Retirement System* v. *Pandit,*
    2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009) ..................................34

*Loveman* v. *Lauder,*
    484 F. Supp. 2d 259 (S.D.N.Y. 2007) .................................22, 23, 24

*Lyondell Chemical Co.* v. *Ryan,*
    970 A.2d 235 (Del. 2009) ...................................................................26

*In re Morgan Stanley Derivative Litigation,*
    542 F. Supp. 2d 317 (S.D.N.Y. 2008) ...............................................22

*Olsen* v. *Pratt & Whitney Aircraft,*
    136 F.3d 273 (2d Cir. 1998) .................................................................5

*Protas* v. *Cavanagh,*
    2012 WL 1580969 (Del. Ch. May 4, 2012)........................................37

*Rahbari* v. *Oros,*
    732 F. Supp. 2d 367 (S.D.N.Y. 2010) ...............................................26

*Page(s)*

*Rales* v. *Blasband*,
    634 A.2d 927 (Del. 1993) ................................................................*passim*

*Reese* v. *Bahash*,
    2014 WL 4391912 (2d Cir. Sept. 8, 2014) ................................*passim*

*Richman* v. *Goldman Sachs Group, Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ........................................*passim*

*Ryan* v. *Gifford*,
    918 A.2d 341 (Del. Ch. 2007) ................................................. 19-20

*Seminaris* v. *Landa*,
    662 A.2d 1350 (Del. Ch. 1995) .........................................22, 23, 24

*South* v. *Baker*,
    62 A.3d 1, 17 (Del. Ch. 2012) .......................................................33

*Spiegel* v. *Buntrock*,
    571 A.2d 767 (Del. 1990) ..............................................................19

*Staehr* v. *Mack*,
    2011 WL 1330856 (S.D.N.Y. Mar. 31, 2011)...........................16, 22

*Stein* v. *Immelt*,
    472 F. App'x 64 (2d Cir. 2012) ....................................................18

*Stone* v. *Ritter*,
    911 A.2d 362 (Del. 2006) ........................................................27, 28

*Strong* v. *Taylor*,
    877 F. Supp. 2d 433 (E.D. La. 2012).........................................37, 38

*Wal-Mart Stores* v. *Indiana Electrical Workers Pension Trust Fund IBEW*,
    2014 Del. LEXIS 336 (Del. July 23, 2014) ....................................33

*In re Walt Disney Co. Derivative Litigation*,
    825 A.2d 275 (Del. Ch. 2003) .......................................................37

*White* v. *Panic*,
    783 A.2d 543 (Del. 2001) ..............................................................20

*Page(s)*

*Wood* v. *Baum*,
   953 A.2d 136 (Del. 2008) ....................................................................*passim*

### STATUTES AND RULES

28 U.S.C. § 1292(b) ...........................................................................45

DEL. CODE ANN. tit. 8 § 220 ..............................................................33

F.R.A.P. 32(a)(7)(C) ..........................................................................47

F.R.A.P. 30(b)(1) .................................................................................7

Fed. R. Civ. P. 12(b)(6) ......................................................................19

Fed. R. Civ. P. 23.1 ...................................................................*passim*

Second Circuit Local Rule 25.1 .........................................................48

Second Circuit Local Rule 30.1(g) .......................................................7

## STATEMENT OF THE ISSUES PRESENTED

1.      In this putative shareholder derivative action, did the District Court correctly conclude that Plaintiff-Appellant Michael Brautigam's ("Plaintiff") failure to make a pre-suit demand on the Goldman Sachs Board of Directors (the "Board") was not excused under controlling Delaware law, because the Complaint did not plead with particularity that a majority of the Board (i) knew that Goldman Sachs had made alleged misstatements in SEC filings about its compliance with law and its conflict of interest controls, or (ii) had any involvement in formulating those statements?

2.      Should this Court affirm the District Court's dismissal of Plaintiff's claims on the separate and alternative ground that securities fraud liability—the predicate for this derivative action—may not be based on Goldman Sachs' alleged misstatements about the Firm's compliance with law and its conflict of interest controls, which are simply too general and indefinite to be actionable under this Court's precedents, including *City of Pontiac Policemen's and Firemen's Retirement Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("*UBS*"), and thus (i) the directors cannot be liable for exposing the Firm to such claims, and (ii) the Complaint failed to state a claim?

## STATEMENT OF THE CASE

Plaintiff's derivative claims against the Goldman Sachs Board rest on the legally flawed premise that purported misstatements in Goldman Sachs' SEC filings about the Firm's compliance with law and its conflicts of interest controls violated the federal securities laws. (*See* Pl. Br. at 2, 3, 5, 6, 10, 11, 12, 15, 18, 19, 21.) As this Court has repeatedly held, such general statements are *not* actionable as a matter of law.[1] For this reason alone, there is no basis for a

---

[1] *See UBS*, 752 F.3d at 182-83 (bank's statements that it "complie[s] with all applicable laws" are "too general to cause a reasonable investor to rely upon them"); *ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-206 (2d Cir. 2009) ("*JP Morgan*") (bank's general statements about its integrity and risk management are immaterial as a matter of law, because "a reasonable investor would not depend on [such statements] as a guarantee that [the bank] would never take a step that might adversely affect its reputation"); *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 235-36 (2d Cir. 2014) (affirming District Court's recognition that "generalizations about a company's business practices and integrity" are immaterial as a matter of law), *aff'g Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013), *reconsideration denied* (June 13, 2013) ("*Barclays*"); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (credit rating agency's "generic, indefinite" statements about its internal processes are inactionable, because "no reasonable purchaser . . . would view statements such as these as meaningfully altering the mix of available information about the company") ("*Boca Raton*"); *Reese* v. *Bahash*, 2014 WL 4391912 (2d Cir. Sept. 8, 2014) (summary order) (statements about the "independence" and "integrity" of ratings "are too general to cause a reasonable investor to rely upon them as a guarantee that ratings would not be made without regard to profits, market share, or client feedback") ("*Boca Raton II*").

derivative claim here. And, even assuming the statements were actionable, demand on the Board was not excused, as the District Court correctly held below.

Plaintiff alleged that seven members of the thirteen-member Goldman Sachs Board breached their fiduciary duties of loyalty because they purportedly "oversaw and signed" SEC filings containing general aspirational statements about the Firm's business principles and conflict of interest controls—*e.g.*, "[w]e are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us"; "[i]ntegrity and honesty are at the heart of our business"; and "we have extensive procedures and controls . . . designed to identify and address conflicts of interest." (Pl. Br. at at 10-11, 15.) Plaintiff claimed that these supposedly misleading statements exposed the Firm to securities fraud liability, because a Goldman Sachs business unit allegedly engaged in conduct inconsistent with those statements in connection with three collateralized debt obligation offerings (the "CDOs") in 2006 and 2007. (*Id*. at 5-6.)

The District Court correctly dismissed the Complaint because Plaintiff did not make a pre-suit demand that the Board take action regarding his allegations—the threshold requirement to bring a derivative action under the controlling law of Delaware, where Goldman Sachs is incorporated. On appeal, Plaintiffs protests that his failure to make a demand was excused, because a majority of the Board could not impartially consider his claims against them.

(Appendix ("A") 60-66 ¶¶ 128-36.)  This Court should affirm on two separate and independent grounds.

*First*, as the District Court held, the Complaint fell far short of alleging particularized facts, as required to excuse demand under *Rales* v. *Blasband*, 634 A.2d 927 (Del. 1993), establishing that a majority of the Board faced a substantial likelihood of liability for the Firm's statements about its compliance with law and internal controls.  (A162.)  As a threshold matter, the Complaint did not plead with the required particularity that any of the outside directors, who constituted a majority of the Board, "consciously disregarded" the alleged misconduct involving the CDOs that supposedly rendered false the challenged statements.  (*Id.*)  As the District Court emphasized, the Complaint did not allege "that any of the Outside Directors made decisions regarding the CDOs, knew what disclosures were and were not made to prospective CDO investors, or had knowledge of any details of Goldman's transactions regarding the short and long positions it took in the CDOs."  (*Id.*)

*Second*, this Court should affirm on the separate and independent ground that Goldman Sachs' general statements about its compliance with law and its internal controls simply are not actionable under the securities laws in the first

place.[2]  Although the District Court correctly dismissed the Complaint, the Court erroneously assumed, consistent with its ruling in a related putative securities action against Goldman Sachs premised on the same statements,[3] that such statements are actionable.  That assumption cannot be squared with this Court's multiple decisions dismissing federal securities claims premised on a bank's general statements about its compliance with law and its internal controls.   As this Court recently held in *UBS*, "general statements about reputation, integrity, and compliance with ethical norms"—even if "knowingly and verifiably false when made"—cannot give rise to a claim under the securities laws, because such statements are not "sufficiently specific for an investor to reasonably rely on [them] as a guarantee of some concrete fact or outcome."  752 F.3d at 183, 185. Thus, because the challenged disclosures are not actionable, this Court can—and should—affirm the dismissal on the separate and additional ground that the Complaint does not state any claim against Goldman Sachs or its directors, or otherwise expose them to any risk of liability for purposes of excusing demand.

---

[2]     "It is well settled that [this Court] may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court."  *Olsen* v. *Pratt & Whitney Aircraft,* 136 F.3d 273, 275 (2d Cir. 1998) (quotation marks omitted).

[3]     *See Richman* v. *Goldman Sachs Grp., Inc.,* 868 F. Supp. 2d 261 (S.D.N.Y. 2012).

## STATEMENT OF FACTS

### A. The Parties

*Defendants-Appellees.* Nominal Defendant Goldman Sachs is a Delaware corporation. (A16 ¶ 18.) The Individual Defendants—seven members of the thirteen-member Goldman Sachs Board when Plaintiff filed his Complaint—are (i) three Goldman Sachs officers, Goldman Sachs' Chief Executive Officer (Lloyd C. Blankfein), Chief Operating Officer (Gary D. Cohn) and former Chief Financial Officer (David A. Viniar),[4] who also currently serve on the Board (A17-18 ¶¶ 19-21) (the "Executive Directors"); and (ii) four outside directors (Claes Dahlbäck, Stephen Friedman, William W. George, James A. Johnson) who were Board members both at the time of the purported wrongdoing and when Plaintiff filed his Complaint (A19-20 ¶¶ 22-25; 60 ¶ 127) (the "Outside Directors").

The Firm's thirteen directors when Plaintiff filed his Complaint, including the three Executive Director defendants, the four Outside Director defendants and the six outside directors not named as defendants, are highly sophisticated and respected business and academic leaders. Those directors included a former Chairman of the Federal Reserve Bank of New York and Assistant to the President for Economic Policy, the former CEO of

---

[4] Mr. Viniar joined the Board in January 2013 after the alleged misconduct.

PricewaterhouseCoopers LLP, a Harvard Business school professor, and directors of Exxon, PepsiCo and Target.  (A75-78 ¶¶ 4-14; Supplemental Appendix ("SA")[5] 11-20, 49-60.)

       ***Plaintiff-Appellant.***  The Complaint alleged that Plaintiff has been a shareholder of Goldman Sachs "at all relevant times" (A16 ¶ 17; *see also* A60 ¶ 124), but did not disclose Plaintiff's prior efforts to instigate litigation against the Board on theories similar to those alleged here.  Specifically:

- In April 2010, Plaintiff demanded that the Board "take appropriate legal action against" Firm officers and directors for not preventing alleged misconduct in connection with another CDO transaction called Abacus 2007-AC1, the subject of an SEC investigation against a Goldman Sachs affiliate (the "Abacus Demand").  (*See* SA533-35.)  Following a thorough investigation, the Board refused Plaintiff's demand.  (*See* SA536-37.)  Plaintiff never asserted that the Board's refusal of his demand was wrongful or filed a putative derivative action relating to Abacus 2007-AC1.

- While the Board was considering the Abacus Demand, Plaintiff brought a putative derivative action in the District Court, without first making a demand on the Board, alleging fiduciary duty claims against the Board for failing to prevent alleged misconduct, including (i) alleged

---

[5]    Plaintiff failed to comply with Rule 30(b)(1) of the Federal Rules of Appellate Procedure by not affording Defendants an opportunity to include record materials in the Appendix filed with Plaintiff's Brief.  Thus, pursuant to Local Rule 30.1(g), a Supplemental Appendix containing additional materials accompanies Defendants' Brief.

misrepresentations to investors in mortgage-backed securities, and (ii) alleged wrongdoing by a former Goldman Sachs affiliate that operated a mortgage loan servicing business. (*See* SA538-609.) Plaintiff claimed, as he does here, that demand was excused because the Board supposedly was conflicted. (SA595-96 ¶ 147.) Judge Pauley disagreed, dismissing Plaintiff's claims for not complying with the pre-suit demand requirement. *See In re Goldman Sachs Mortg. Servicing S'holder Deriv. Litig.*, 2012 WL 3293506, at *4-9 (S.D.N.Y. Aug. 14, 2012) ("*Brautigam I*"). Plaintiff did not appeal that dismissal.

This appeal concerns Plaintiff's third attempt to manufacture claims against members of the Board.

**B. Goldman Sachs' Disclosures to Sophisticated CDO Investors**

Like other Firm shareholders who have tried—unsuccessfully—to bring derivative actions in the wake of the financial crisis (*see infra* at 13-14), Plaintiff did not invest in the CDOs himself. Instead, he contended that Goldman Sachs misled the sophisticated investors in the CDOs, principally by purportedly not disclosing to those investors that the Firm took "short" positions in connection with those transactions. (A15 ¶13; *see also*, *e.g.*, A10 ¶ 2, 14-15 ¶ 11, 26 ¶ 38, 36-37 ¶¶ 60-62.) On that basis, he claimed in turn that the Firm's public disclosures to its own shareholders about its business principles and conflicts of interest controls were materially false. (A56-57 ¶ 114, 58-59 ¶ 118.)

As to the three CDOs, the Complaint ignored that the respective CDO offering circulars repeatedly made clear that a Goldman Sachs affiliate, Goldman Sachs International ("GSI"), would be the "Credit Protection Buyer" or "Synthetic Security Counterparty" for each CDO—*i.e.*, would hold the "short" side of the credit default swaps that provided synthetic exposure to the CDOs—and, thus, that the Firm's interests might conflict with investors' interests.[6] Indeed, each offering circular expressly stated that GSI's role—as well as various other roles of Firm affiliates and other parties—created "potential and actual conflicts of interest." (SA127-31; 218-21; 314-17.)[7]

---

[6]   *See* SA96 ("On the Closing Date, the Issuer and Goldman Sachs International, as the Credit Protection Buyer, will enter into the Credit Default Swap . . . ."), 189 ("On the Closing Date, the Issuer and Goldman Sachs International, as the Credit Protection Buyer, will enter into the Credit Default Swap . . . ."), 301 ("It is expected that Goldman Sachs International, an affiliate of Goldman, Sachs & Co., will act as the sole Synthetic Security Counterparty . . . ."); *see also id.* at 73, 80, 105, 117, 121, 130, 147; 266-67, 284, 318, 338.

[7]   The Complaint did not dispute that the offering circulars for the CDOs accurately described the reference portfolios, including their substantial exposure to risky mortgages, and contained extensive disclosures concerning the many risks of investing in the CDOs.  (*See* SA106, 123-24, 132, 157, 198, 212-22, 224-25, 294-317.)  Nor did Plaintiff dispute that the offering circulars were explicitly directed solely to "sophisticated investor[s]," who, as a condition to their investment in the CDOs, represented that they were "not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representation" of Goldman Sachs.  (SA77-80, 175-78, 264-67.)

### C.    Goldman Sachs' Public Disclosures

The SEC filings supposedly rendered false by Goldman Sachs' purportedly undisclosed conflicts in connection with the CDOs did not mention the CDOs or even those types of transactions.  Instead, the Complaint focused on Goldman Sachs' general disclosures that the Firm's business increasingly involved conflicts of interest, "including situations where **our services to a particular client or our own investments or other interests conflict,** or are perceived to conflict, **with the interests of another client**," and that such "conflicts could give rise to litigation or regulatory enforcement actions."  (SA367 (emphasis added); *see also* 410; 449-50; 487; 523.)  Similarly, the Firm disclosed that "**[c]onflicts of interest are increasing** and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses," and that, although the Firm had "extensive procedures and controls that are designed to identify and address conflicts of interest," such procedures may "fail," because "dealing with conflicts of interest is complex and difficult."  (SA367 (emphasis added); *see also* 410, 449-50, 487, 523.)

Despite quoting much of this unambiguous language—which plainly disclosed the ongoing existence of actual conflicts and associated risks for the Firm (*see*, *e.g.*, A56 ¶ 113)—the Complaint asserted that these statements actually "*disclaim[ed]* that . . . conflicts could occur when they already had" and

"*disclaimed* risks of conflicts between the interests of the Company and those of its clients." (A10 ¶ 2, 55 ¶ 111 (emphasis added); *see also* A15 ¶ 13 (erroneously referring to the Firm's disclosures as "'no conflict' disclaimers").)

Based on this faulty premise, the Complaint alleged that, because conflicts in the CDOs allegedly "already existed," Goldman Sachs' general disclosures about its conflicts controls and other general public statements about the Firm's commitment to compliance with law and other business principles were false or misleading under the federal securities laws. (A56-57 ¶ 114, 58-59 ¶ 118.) As itemized in Plaintiff's brief, those statements include:

- "Our reputation is one of our most important assets."

- "Integrity and honesty are at the heart of our business."

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us."

- "Our assets are our people, capital and reputation."

- "Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow."

- "We have extensive procedures and controls that are designed to . . . address conflicts of interest."

- "[W]e increasingly have to address potential conflicts of interest, including situations where . . . our own . . . investments or other interests conflict, or are perceived to conflict, with the interests of another client."

- "[A] failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses."

(Pl. Br. at 10-11; *see also* A56-57 ¶¶ 113-14.)

None of these general statements refers or relates to any particular transaction, or even a line of business (much less CDO transactions), or otherwise guarantees that the Firm will achieve any specific result. Plaintiff nonetheless asserts that these aspirational statements support a federal securities law claim against Goldman Sachs—for which the Firm's directors supposedly face personal liability—because the statements purportedly were inconsistent with the Firm's allegedly undisclosed conflicts in connection with the three CDOs. Specifically, the Complaint sought to hold the Individual Defendants liable for breach of the fiduciary duty of loyalty by asserting, without explanation, that the Individual Defendants "caused" these allegedly false statements to be included in the Firm's SEC filings and annual reports to shareholders ("Annual Reports"). (*See*, *e.g.*, A55-57 ¶¶ 112, 114.)

**D.     Prior Mortgage-Related Putative Derivative Suits Against the Board**

        In addition to *Brautigam I*, in the wake of the financial crisis, Goldman

Sachs shareholders other than Plaintiff have brought putative derivative actions

against the Goldman Sachs Board, including in federal court and Delaware and

New York state courts, alleging that the Board breached its fiduciary duties by

failing to oversee the Firm's mortgage-related business.[8]  All of those actions have

been dismissed.

        Most notably, in 2011, the Delaware Chancery Court dismissed a

putative derivative action brought by another Goldman Sachs shareholder asserting

claims against the Board based on Goldman Sachs' CDO activities, including the

CDOs relevant here, on the ground that the Delaware plaintiffs had not pled

particularized facts sufficient to excuse pre-suit demand under Delaware law.  *See*

*In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104 (Del. Ch. Oct.

12, 2011), *aff'd sub nom.*, *SE. PA Transp. Auth.* v. *Blankfein*, 44 A.3d 922, 2012

WL 1563893 (Del. May 3, 2012) (unpublished disposition).  In a detailed decision

subsequently affirmed in its entirety by the Delaware Supreme Court, the Chancery

Court held that allegations concerning the Board's purported failure to exercise

---

[8]     *See In re Goldman Sachs Grp., Inc. Deriv. Litig.*, 1:10-cv-03614-PAC
(S.D.N.Y.); *In re The Goldman Sachs Grp., Inc. S'holder Litig.*, C.A. No. 5215-
VCG (Del. Ch.); *In re The Goldman Sachs Grp., Inc. Deriv. Litig.*, No.
650318/2010 (N.Y. Sup. Ct. N.Y. County).

proper oversight of Goldman Sachs' CDO business did not demonstrate that the Board was aware of and consciously disregarded any wrongdoing and, thus, did not give rise to a substantial likelihood of director liability. *Id.* at *18-23.

**E.    The District Court's Dismissal of Plaintiff's Complaint**

Defendants moved to dismiss the Complaint on the grounds that Plaintiff failed to allege facts sufficient to excuse demand or to state a claim. The District Court granted Defendants' motion, holding that Plaintiff's failure to make a demand was not excused (despite the Court's erroneous assumption that the underlying statements are actionable). (*See* A148, 164.) Applying settled Delaware law, the District Court ruled that the test for assessing whether demand is excused enunciated by the Delaware Supreme Court in *Rales* v. *Blasband* (which generally applies to allegations of Board inaction) governs claims, like those asserted here, "that directors violated their fiduciary duties based on corporate misstatements." (A159.) Applying *Rales*, the District Court rejected Plaintiff's assertion that a majority of the Board faced a substantial likelihood of liability for Plaintiff's claims and, therefore, could not consider a demand impartially, because Plaintiff failed to allege particularized facts establishing that the Outside Directors were aware of the alleged misconduct that supposedly rendered the alleged misstatements false, or that the directors were involved in the formulation of the alleged misstatements. (*See* A163.)

-14-

The District Court further concluded that even if Plaintiff's claims were governed by the test for assessing whether demand is excused set forth in *Aronson* v. *Lewis*, 473 A.2d 805 (Del. 1984), (which generally applies to allegations of affirmative Board action), the Complaint still would be dismissed. The Court concluded that Plaintiff's failure to make a demand was not excused even under the *Aronson* test, because the Complaint failed to allege particularized facts establishing conscious wrongdoing by the Outside Directors and fell "far short of alleging that the Outside Directors acted in bad faith in whatever role they may have played in the issuance of the alleged misstatements." (A159-60, 163.)

The District Court reached those conclusions after erroneously finding—in accordance with its holding in *Richman*—that the underlying disclosures themselves are actionable. (A160-61.) In *Richman*, the District Court held that the plaintiffs had "sufficiently alleged that Goldman made material misstatements about its business practices and conflicts of interest, viewed in light of its role and conduct in the [CDOs]," concluding that Goldman Sachs' "repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest [are not] mere puffery."

*Richman*, 868 F. Supp. 2d at 279-80.[9]  The District Court reiterated that holding in dismissing this derivative action.  (A160-61.)

## SUMMARY OF ARGUMENT

The District Court properly dismissed the Complaint, because Plaintiff's failure to make a demand on the Goldman Sachs Board was not excused under Delaware law.  That ruling was correct both for the reasons explained by the District Court and because the challenged statements are not actionable as a matter of law.

*First*, as the District Court held, the *Rales* standard for assessing demand futility applies to Plaintiff's claims based on Goldman Sachs' alleged misstatements about general business principles and conflict of interest controls, because the Complaint did not contain "any particularized allegations about a specific board decision to omit the information at issue or to make misleading statements."  *Staehr* v. *Mack*, 2011 WL 1330856, at *4 (S.D.N.Y. Mar. 31, 2011) (citing Delaware cases).  As the District Court recognized, even if the *Aronson* standard applicable to affirmative board decisions governed here, the Complaint

---

[9]    Following this Court's decision in *UBS*, Defendants moved for reconsideration of the District Court's decision in *Richman*.  The District Court denied that motion, holding that *UBS* did not apply despite the striking similarity of the challenged statements in the two actions.  *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014).  (*See also infra* at n. 19.)

-16-

did not adequately allege that the Outside Directors engaged in bad faith conduct sufficient to overcome the protections of the business judgment rule.

*Second,* the District Court correctly concluded that, under *Rales*, Plaintiff "failed to plead particularized facts that create a reasonable doubt that a majority of Goldman's Board of Directors could have exercised disinterested and independent business judgment in considering demand." (A164.) As the District Court explained, the Complaint did not establish that a majority of the Board is substantially likely to be liable for any of the alleged misstatements, because— even assuming that the statements are actionable—it "fails to make particularized pleadings that any of the Outside Directors made decisions regarding the CDOs, [or] knew what disclosures were and were not made to prospective CDO investors." (A162.) Nor did the Complaint plead "how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused." (A163 (internal quotation marks omitted).)

*Third*, the District Court should have held that the challenged statements about Goldman Sachs' compliance with law and conflicts controls are inactionable as a matter of law in the first place. As this Court has made clear, no reasonable investor could rely on such statements as guarantees of the effectiveness of those principles and controls in *all* circumstances. *See*, *e.g.*, *UBS*,

-17-

752 F.3d at 183; *Barclays*, 750 F.3d at 235-6; *Boca Raton*, 506 F. App'x at 37; *Boca Raton II*, 2014 WL 4391912, at *2; *JP Morgan*, 553 F.3d at 205-206.  Thus, this Court can—and should—affirm the dismissal on the separate and additional ground that the Complaint does not state any claim against Goldman Sachs or its directors, or otherwise expose them to any risk of liability for purposes of excusing demand.

## STANDARD OF REVIEW

Where "determination of the sufficiency of allegations of [demand] futility depends on the circumstances of the individual case, the standard of review for dismissals based on Fed. R. Civ. P. 23.1 is abuse of discretion."  *Halebian* v. *Berv*, 590 F.3d 195, 203 (2d Cir. 2009).  At the same time, where "a challenge is made to the legal precepts applied by the district court in making a discretionary determination, plenary review of the district court's choice and interpretation of those legal precepts is appropriate."  *Id.*[10]  This Court reviews *de novo* rulings on

---

[10]    Although there currently exists in the Second Circuit "an open question of the appropriate standard of review in demand futility cases," *Kautz* v. *Sugarman*, 456 F. App'x 16, 18 (2d Cir. 2011), this Court should review the District Court's demand futility ruling only for abuse of discretion, because the District Court's determination that Plaintiff failed to establish that a majority of the Board could not impartially consider a demand merely applied settled Delaware law to the specific allegations of the Complaint here, *see Stein* v. *Immelt*, 472 F. App'x 64, 65 (2d Cir. 2012).  Even under a *de novo* standard, the District Court's dismissal should be affirmed.

motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See JP Morgan*, 553 F.3d at 196.

## ARGUMENT

**I. THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFF'S FAILURE TO MAKE A DEMAND ON THE GOLDMAN SACHS BOARD IS NOT EXCUSED.**

It is "a cardinal precept" of Delaware law that boards of directors, not shareholders, manage a corporation's affairs. *Aronson*, 473 A.2d at 811. Because "[t]he decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation," *Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990), "the corporation, acting through its board of directors . . . must make the decision whether or not to assert the claim," *Grimes* v. *Donald*, 673 A.2d 1207, 1215 (Del. 1996). Thus, a shareholder seeking to sue on behalf of a Delaware corporation must first make a demand that its board take action. *See Aronson*, 473 A.2d at 811.

Under Delaware law, shareholders who do not make a demand must meet "stringent requirements of factual particularity" to excuse their failure to do so.[11] *Brehm* v. *Eisner*, 746 A.2d 244, 254 (Del. 2000). Satisfying this heightened

---

[11] Like Delaware Chancery Court Rule 23.1, Federal Rule of Civil Procedure 23.1 imposes a heightened pleading standard in putative derivative actions brought in federal court, requiring a complaint to "state with particularity . . . the reasons for not obtaining the action [from the directors] or not making the

(footnote continued)

-19-

pleading standard is "a difficult feat under Delaware law." *Ryan* v. *Gifford*, 918 A.2d 341, 352 n.23 (Del. Ch. 2007).

The District Court correctly held that Plaintiff did not satisfy Delaware's heightened pleading standard because, even assuming that the statements are actionable, the Complaint did not demonstrate that a majority of Goldman Sachs' thirteen-member Board suffered from conflicts disabling them from impartially considering a demand when Plaintiff filed the Complaint. (*See* A163.) It is undisputed that ten members of the Board are independent— which makes Plaintiff's already heightened hurdle for pleading demand futility even harder, if not impossible, to clear, *see White* v. *Panic*, 783 A.2d 543, 551 (Del. 2001)—and Plaintiff conceded that the six non-defendant independent directors are disinterested (*see* A60 ¶ 127). Thus, even assuming that Plaintiff could show that the three Executive Directors are interested, to establish that a majority of the thirteen-member Board could not impartially consider a Demand,

_____

(footnote continued)

effort." Fed. R. Civ. P. 23.1(b)(3)(B). In assessing whether to excuse demand, courts apply the substantive law of the nominal defendant's state of incorporation, here, Delaware. *See Kamen* v. *Kemper Fin. Serv., Inc.*, 500 U.S. 90, 98-99 (1991). Delaware and federal courts have consistently emphasized that the demand requirement is a matter of substantive, not procedural, law. *See, e.g., Braddock* v. *Zimmerman*, 906 A.2d 776, 784 (Del. 2006) ("The demand requirement of Rule 23.1 is a substantive right") (internal quotation omitted). The District Court thus correctly concluded that Delaware law controls whether Plaintiff's failure to make a pre-suit demand is excused. (*See* A158.)

-20-

the Complaint must show that *all four* of the Outside Directors named as defendants also are interested. Plaintiff's conclusory allegations fell far short of doing so.

**A.      The District Court Correctly Held that the *Rales* Test Applies Here.**

To excuse pre-suit demand in a putative derivative action based on board *inaction*, *Rales* requires a plaintiff to plead particularized facts "creat[ing] a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. In putative derivative actions based on *affirmative* board decisions, *Aronson* requires a plaintiff to plead particularized facts giving rise to a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814.

Plaintiff erroneously argues, as he did below, that his demand futility allegations should be evaluated under the *Aronson* test, rather than *Rales*, by characterizing the issuance of the alleged misstatements regarding the Firm's business practices and procedures as a "conscious decision" by the Board. (Pl. Br. at 14, 13-20.) But the Complaint alleged only that the Board "caused" those statements to be issued (*see*, *e.g.*, A56-57 ¶¶ 113-14); it did not allege with particularity that the Outside Directors had any role in formulating the alleged

-21-

misstatements or made any decisions about information to include or not include in those disclosures.

As the District Court recognized, Delaware law is clear that but for a "specific board decision to omit the information at issue or to make misleading statements," *Staehr*, 2011 WL 1330856, at *4, fiduciary duty claims premised on allegations of corporate misstatements are treated as claims that the directors did not prevent the alleged misstatements, which must meet the stringent standards for pleading that directors breached their duty of oversight under *Caremark*, 698 A.2d 959 (Del. Ch. 1996). (*See* A159, 161 (citing *Wood* v. *Baum*, 953 A.2d 136, 140 (Del. 2008); *Seminaris* v. *Landa,* 662 A.2d 1350, 1354 (Del. Ch. 1995); *Loveman* v. *Lauder*, 484 F. Supp. 2d 259, 266, 270 (S.D.N.Y. 2007).)[12]

Plaintiff wrongly asserts that by signing SEC filings the Board members transformed the statements contained in those filings into "board actions" for purposes of assessing demand futility. (Pl. Br. at 19-20.) As the District Court explained, Delaware law is expressly to the contrary. (*See* A159-60 (citing *Seminaris*, 662 A.2d at 1354) (applying *Rales* because "plaintiff does not challenge

12 *See also, e.g.*, *Guttman* v. *Huang*, 823 A.2d 492, 505-06 (Del. Ch. 2003) (holding that failure to prevent misleading financial statements is a *Caremark* claim governed by *Rales*); *In re Morgan Stanley Deriv. Litig.*, 542 F. Supp. 2d 317, 321-22 (S.D.N.Y. 2008) (applying *Rales* where complaint made "no allegations explaining any process by which the board decided to omit the information" or any "active[] or purposeful[] . . . decision to omit the information").

a decision of [corporation's] board of directors" despite "alleg[ing] that certain board members signed misleading statements on behalf of the corporation").)[13]

Plaintiff also incorrectly contends that the District Court misapplied three decisions in holding that *Rales* applies here—*Loveman*, 484 F. Supp. 2d 259; *Wood*, 953 A.2d 136; and *Seminaris*, 662 A.2d 1350. (*See* Pl. Br. at 16-19.) But Plaintiff mischaracterizes those three decisions and his own allegations in erroneously claiming that "*Loveman* and *Wood* applied *Aronson* to board statements in executed financial statements," and that *Seminaris* applied *Rales* only "because of the absence of board link [*sic*] to the misleading statements." (*Id.* at 18.)

*Loveman*, *Wood* and *Seminaris* all applied the *Rales* standard to claims based on alleged corporate misstatements analogous to Plaintiff's claims here. In *Seminaris*, the plaintiff argued, like Plaintiff here, that the *Aronson* test applied to his claim that the defendant board was responsible for public misrepresentations about the company's financial condition and had signed various regulatory filings containing misleading statements. *See* 662 A.2d. at 1352, 1354.

---

[13]     The Complaint did not even allege that the Outside Directors signed all of the disclosures containing the alleged misstatements. Despite Plaintiff's assertion, conspicuously without citation, that the Outside Directors "published and distributed" the Firm's Annual Reports (*see* Pl. Br. at 10), the Complaint did not and could not allege that the Outside Directors signed or otherwise participated in preparing those reports.

In rejecting the plaintiff's argument, the *Seminaris* court explained—as the District Court did here (*see* A159)—that the *Aronson* test does not apply where "a plaintiff does not challenge any specific board action that approved or ratified the[] alleged wrongdoings." 662 A.2d at 1354. Plaintiff concedes that *Seminaris* applied *Rales* to claims based on allegedly misleading statements signed by directors (*see* Pl. Br. at 18), but he tries to distinguish *Seminaris* by cryptically asserting that he, unlike the *Seminaris* plaintiffs, "pleaded a direct link" between the Board's purported knowledge of alleged misconduct and "their decision to omit this information and sign and file a false and misleading SEC Form 10-K." (Pl. Br. at 18-19.) But the Complaint did not allege that the Board made any decisions about information to include in the filings and reports containing the alleged misstatements, much less that the Board decided to omit information about the supposed misconduct surrounding three specific CDOs.

In *Loveman*, the plaintiff alleged both that the board had approved a stock purchase resulting in corporate waste, and that it had "fail[ed] adequately to oversee the corporation's activities," including "issu[ing] false press releases to inflate the price of [the company's] stock." 484 F. Supp. 2d at 263, 266. The court applied *Aronson* only to the stock purchase claim because, it concluded that the stock purchase was the only "specific business decision made or approved by the board" alleged in the complaint, *id.* at 263. Plaintiff's argument that the court also

-24-

"analyzed statements in a company's Form 8-K" under the *Aronson* standard is misleading.  (*See* Pl. Br. at 16-17.)  Although the court referred to certain omissions in a Form 8-K filing in the course of its *Aronson* analysis of the stock purchase, the court discussed that filing only to assess an argument that the alleged omissions were evidence that the stock purchase was not a valid exercise of business judgment.  *Id.*  The court evaluated the plaintiff's claims alleging false statements in press releases under *Rales*, 484 F. Supp. 2d at 270, describing them as "precisely the type of [claims of] director *in*action that trigger[] the more exacting *Rales-Caremark* standard," *id.* at 266.

Plaintiff also erroneously contends that the court in *Wood* "cited *Aronson* as the proper test for execution of financial reports."  (*See* Pl. Br. at 17.) The plaintiff in *Wood* made numerous allegations, including that "(a) the defendants executed [the company's] annual reports and other publicly filed financial reports," which the plaintiff claimed were false, and that "(b) the defendants authorized certain transactions," which the plaintiff claimed were fraudulent.  953 A.2d at 139, 142.  The court applied *Aronson* only to the latter claim.  *See id.* at 142 & 142 n.18.

-25-

**B.    The District Court Correctly Ruled That Demand Was Not Excused Under *Rales* Because the Complaint Did Not Give Rise To a "Substantial Likelihood" of Director Liability.**

Under *Rales*, because Plaintiff concedes the Outside Directors' independence, he must plead particularized facts showing that the Outside Directors suffer from a disabling interest, such as that they "face a substantial likelihood of personal liability" for the claims asserted against them.  *Guttman* v. *Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (internal quotation omitted).  Cases in which "liability qualifies as an interest for the purpose of excusing demand occur[] rarely,"  *Rahbari* v. *Oros*, 732 F. Supp. 2d 367, 378 (S.D.N.Y. 2010) (internal quotations omitted), because claims for breach of the fiduciary duty of loyalty—like Plaintiff's claims here—require an "*extreme set of facts*" showing that the directors "*intentionally* fail[ed] to act in the face of a *known* duty to act, demonstrating a *conscious* disregard for [their] duties,"  *Lyondell Chem. Co.* v. *Ryan*, 970 A.2d 235, 243 (Del. 2009) (emphasis added) (internal quotation omitted).

Under Delaware law, disloyalty claims based on a board's alleged failure of oversight present "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *Caremark*, 698 A.2d at 967, and require proof that "(a) the directors *utterly failed to implement* any reporting or information system or controls; or (b) having implemented such a system or

controls, *consciously failed* to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention," *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added).

To satisfy either prong of this test, "imposition of liability requires a showing that the directors *knew* that they were not discharging their fiduciary obligations." *Id*. (emphasis added). Plaintiff cannot simply point to some alleged misconduct and conclude *ex post facto* that directors violated their fiduciary duties. This is because "no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law." *Caremark*, 698 A.2d at 970.

Moreover, because Goldman Sachs' certificate of incorporation immunizes its directors from personal liability for actions taken in good faith (*see* SA617), "plaintiff[s] must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood*, 953 A.2d at 141; *see also Goldman Sachs,* 2011 WL 4826104, at *18 ("The likelihood of directors' liability is significantly lessened where, as here, the corporate charter exculpates the directors from liability . . . ."). Under this stringent standard, the Complaint must have

-27-

alleged "facts that, if proven, would show that a majority of the defendants *knowingly engaged in 'fraudulent' or 'illegal' conduct.*"  *Wood*, 953 A.2d at 141 (emphasis added).  As the District Court recognized, Plaintiff's Complaint fell far short of meeting these stringent requirements.

Plaintiff did not and could not allege that the Outside Directors knowingly and in bad faith "utterly failed to implement any reporting or information system or controls."  *Stone,* 911 A.2d at 370.  To the contrary, as the District Court stressed, "Plaintiff concedes that corporate governance and reporting systems were in place."  (*See* A162.)  Indeed, the Complaint detailed the Firm's oversight mechanisms, including its robust committee and reporting structure. (*See* A20-22 ¶¶ 26-29, 24-25 ¶ 36, 39 ¶ 69, 47 ¶ 93, 49 ¶ 99).  Far from suggesting that Defendants "failed to implement any reporting or information system or controls," *Stone*, 911 A.2d at 370, Plaintiff's allegations show "that the Director Defendants kept themselves reasonably informed and fulfilled their duty of oversight in good faith."  *Goldman Sachs*, 2011 WL 4826104, at *23.

Nor did the Complaint come anywhere close to alleging a particularized basis on which to infer that the Outside Directors "consciously failed" to fulfill their oversight obligations.  *Stone,* 911 A.2d at 370.  To the contrary, as the District Court correctly concluded, "[t]here are no specific factual allegations to support that the Outside Directors 'consciously disregarded'

-28-

wrongdoing or 'knew that they were not discharging their fiduciary obligations.'" (A162 (citing *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009)).)

As the District Court recognized, the Complaint did not allege particularized facts demonstrating that the Outside Directors knew of the alleged misconduct in connection with the CDOs that supposedly rendered the Firm's statements about business principles and conflict controls false and misleading.[14]

---

[14]     Defendants reject any assertion that the Firm's conduct in connection with the CDOs was inappropriate.  Goldman Sachs accurately disclosed to the sophisticated investors in the CDOs both the characteristics of the transactions and Goldman Sachs' interest in the transactions; and the transaction prices were negotiated at arm's length and reflected the market at the time of sale.  Goldman Sachs did not fail to disclose any clairvoyant knowledge about the future performance of the securities; the sophisticated investors in the CDOs were fully capable of making their own investment decisions and managing their own risk exposure, and they committed to do so.  Courts have dismissed multiple lawsuits brought by CDO investors, including against Goldman Sachs, for these and other reasons.  *See, e.g.*, *ACA Fin. Guar. Corp.* v. *Goldman, Sachs & Co.*, 106 A.D.3d 494, 496-97 (N.Y. App. Div. 2013) (dismissing fraud claim relating to CDO because sophisticated plaintiff could not show justifiable reliance in light of disclosures and disclaimers in offering circular); *Landesbank Baden-Württemberg* v. *Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623-24 (S.D.N.Y. 2011) (dismissing misrepresentation claims brought by sophisticated CDO investor, in part because the investor had failed to plead that Goldman Sachs had any knowledge about future market direction or any "special relationship" with the institutional investor), *aff'd*, 478 F. App'x 679 (2d Cir. 2012); *Loreley Fin. (Jersey) No. 4 Ltd.* v. *UBS Ltd.*, 963 N.Y.S.2d 566, 576 (N.Y. Sup. Ct. 2013) (rejecting CDO fraud claim because "UBS was the disclosed counterparty to the CDS contracts"); *Basis Yield Alpha Fund Master* v. *Morgan Stanley*, 2013 WL 942359, at *2 (N.Y. Sup. Ct. Feb. 28, 2013) ("The offering documents disclosed that Morgan Stanley was the 'CDS Counterparty' in connection with [the CDO],

(footnote continued)

(*See* A162-63.)  *See also Citigroup*, 964 A.2d at 133-34 ("[T]o establish a threat of director liability based on a disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith, a showing that requires allegations regarding what the directors knew and when.").

Plaintiff did not and cannot allege that the Board was responsible for personally knowing about or managing the details of the three CDOs or any of the many other thousands of other transactions that take place daily across the Firm's varied businesses.  As the *Caremark* court held, directors cannot be expected to know the details of daily operations, much less the specifics of three transactions in a small segment of a large global financial institution.  *See* 698 A.2d at 968-71.

The Complaint relies principally on two high-level presentations to the Board in March and September 2007 concerning the Firm's mortgage-related activities as supposed evidence of the Board's knowledge of the alleged misconduct that purportedly rendered Goldman Sachs' general statements about its principles and processes false and misleading.  (*See* A39-42 ¶¶ 69-76, 47-48 ¶¶ 93-97.)  As the District Court explained, "Plaintiff fails to plead particularized facts showing that the presentations allegedly attended by the Outside Directors

─────────────────────

(footnote continued)

and would be paid if the underlying collateral declined in quality.  A position that is disclosed is not within the peculiar knowledge of Morgan Stanley. . . .").

mentioned the three CDOs as issue in this case, let alone any misconduct." (A163.) At most, the presentations on their face summarized mortgage market trends and the Firm's prudent efforts to reduce its risk exposure in light of deteriorations in the subprime mortgage market. (*See* A79-104, 105-119.) Plaintiff's bald assertions that the discussions surrounding these presentations "necessarily included" the Firm's positions in the CDOs (A41), or that "there is every reason to believe" these topics were discussed (A42), are not sufficient to establish that the Outside Directors "had 'actual or constructive knowledge' that their conduct was legally improper," *Wood*, 953 A.2d at 141.

The District Court's analysis is consistent with decisions by both Judge Pauley in *Brautigam I* and the Delaware Chancery Court (affirmed by the Delaware Supreme Court) rejecting arguments that the two board presentations provide a sufficient basis on which to infer that the Outside Directors knew of any purported wrongdoing in connection with the Firm's CDO transactions. (*See* A163 (citing *Brautigam I*, 2012 WL 3293506, at *8); *Goldman Sachs*, 2011 WL 4826104, at *19-23.) As the Chancery Court also held, "[t]here is nothing intrinsic in . . . shorting the mortgage market that makes these actions illegal or wrongful." *Goldman Sachs,* 2011 WL 4826104, at *20. Rather, decisions to hedge against market risk are "[l]egal, if risky, actions that are within management's discretion to

-31-

pursue [and] are not 'red flags' that would put a board on notice of unlawful conduct." *Id.*

Ultimately, Plaintiff must speculate, as he did below, that the Board *must have known* about the alleged misconduct because (i) Goldman Sachs has internal reporting requirements, including the Firm's Code of Business Conduct and Ethics and other policies regulating internal communications, (b) Goldman Sachs has a robust governance structure, and (c) the Outside Directors were members of Goldman Sachs' Audit and Risk committees,[15] supposedly charged with "oversight of the Company's compliance with legal and regulatory requirements." (Pl. Br. at 9, 19, 22-24.) As the District Court recognized, under Delaware law, such allegations do not plead director knowledge with sufficient particularity to establish a substantial likelihood of liability. (*See* A163.) *See also Brautigam I*, 2012 WL 3293506, at *6-7 (Plaintiff's "theor[y] that Goldman has a

---

[15] Plaintiff conflates the Board's Risk Committee with the Firmwide Risk Committee ("FRWC") which is comprised solely of Firm employees and does not include any of the Outside Directors, as the Complaint acknowledges (*see* A19-20 ¶¶ 22-25, 22 ¶ 32, 23 ¶ 35 & n.4). Nothing in the Complaint or Plaintiff's brief suggests that any disclosures to any investors in the CDOs were discussed at any FWRC meeting, let alone any Board Risk Committee meeting. Nor did Plaintiff allege with any particularity that the Outside Directors' membership on the Audit Committee exposed them to any information regarding specific CDO transactions or proposed disclosures to the investing public. As the District Court recognized, "[m]erely alleging membership on a committee does not meet the standard for particularized pleading under Rule 23.1 necessary to establish that directors had knowledge of alleged misconduct." (A163 (citing *Wood*, 953 A.2d at 142).)

robust governance structure and therefore, that the Board Defendants must have been aware" of misconduct is "simply contrary to established law"). Plaintiff ignores the overwhelming weight of authority in advancing this argument again on appeal. *See*, *e.g.*, *South* v. *Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1.").

Plaintiff also wrongly asserts that the Outside Directors must have known of the alleged misconduct because the Executive Directors (also Firm officers) supposedly knew about it. (Pl. Br. at 15-16 (citing *Wal-Mart Stores* v. *Ind. Elec. Workers Pension Trust Fund IBEW*, 2014 Del. LEXIS 336 (Del. July 23, 2014).) But the Complaint did not allege particularized facts purportedly demonstrating that the Executive Directors knew of the disclosures made to the investors in the three CDOs or any other alleged misconduct. In any event, even if the Complaint had made those allegations, Plaintiff's reliance on *Wal-Mart* is misplaced. *Wal-Mart* assessed whether shareholders had stated a "proper purpose" for seeking corporate books and records under Section 220 of the Delaware Code, not whether those shareholders had met the heightened pleading standards

applicable to demand futility allegations in a putative shareholder derivative action. 2014 Del. LEXIS 336, at *15-17.

In derivative actions, "Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes." *Desimone* v. *Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007). "Rather, a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Id.* (emphasis in original)*; see also In re JPMorgan Chase & Co. Deriv. Litig.*, 2014 WL 1297824, at *5 (S.D.N.Y. Mar. 31, 2014) ("Plaintiff cannot satisfy its burden of pleading that a majority of the Board faces a substantial likelihood of personal liability by relying on allegations that a minority of the Board . . . was aware of certain information.").[16]

Putting aside Plaintiff's failure to plead with particularity that the Outside Directors knew of any of the three CDOs or any alleged misconduct in

---

[16]    Plaintiff not only failed to plead that the Outside Directors knew about any alleged misconduct in connection with the CDOs, he also failed to plead "specific factual allegations regarding the individual directors' conduct in response to" any such information. *La. Mun. Police Emps.' Ret. Sys.* v. *Pandit*, 2009 WL 2902587, at *8 (S.D.N.Y. Sept. 10 2009); *see also In re ITT Corp. Deriv. Litig.*, 588 F. Supp. 2d 502, 513 (S.D.N.Y. 2008) (even if red flags were "sufficient to put defendants on notice as to possible misconduct [], without any information regarding the individual Directors' responses, if any, to those events, the Court cannot say whether the Directors failed to act or if the actions they took were appropriate in light of the information they received").

-34-

connection with those transactions, the Complaint did not allege particularized facts demonstrating that the Outside Directors were "actually involved in creating or approving" the public statements purportedly rendered false or misleading by that alleged misconduct. *Citigroup*, 964 A.2d at 133 n.88. As the District Court correctly observed, such "factual details [] are crucial to determining whether demand on the board of directors would have been excused as futile." (A163 (citing *Citigroup*, 964 A.2d at 133 n.88)). Plaintiff's conclusory allegations that the Individual Defendants "oversaw," "cause[d] Goldman to file," "exercised control over," "were complicit in [] filing," or "published and distributed" the disclosures (Pl. Br. at 10, 19, 20) are fatally unsupported by any specific factual allegations in the Complaint and do not come close to a particularized demonstration that the Outside Directors "prepared the financial statements or that they were directly responsible for the misstatements or omissions." *In re Bank of New York Mellon Corp. Forex Transactions Litig.,* 991 F. Supp. 2d 457, 463 (S.D.N.Y. 2013).

Plaintiff wrongly asserts that he does not need to allege "board involvement" in the alleged misstatements because the cases that require such allegations purportedly "only do so as part of establishing the Board's knowledge of the falsity of those misstatements and omissions." (Pl. Br. at 24.) To the contrary, Plaintiff must establish *both* Board involvement in the preparation of

disclosures and Board knowledge of misleading or false statements in those disclosures. *See, e.g.*, *Citigroup*, 964 A.2d at 134; *In re Dow Chem. Co. Deriv. Litig.*, 2010 Del. Ch. LEXIS 2, at *39-40 (Del. Ch. Jan. 11, 2010).

**C.    The District Court Correctly Held That the Complaint Also Fails To Plead Demand Futility Under *Aronson*.**

Even assuming that the *Aronson* standard governing claims based on affirmative board actions applies—*i.e.*, that Plaintiff may excuse the demand requirement by pleading particularized facts giving rise to a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment," 473 A.2d at 814—the District Court correctly held that Plaintiff's allegations also fail that test because "[t]he Complaint does not sufficiently allege that the majority of the directors were interested or dependent, or that the director defendants had knowledge that any disclosures or omissions were false or misleading." (A159.)

"The first prong of *Aronson* is, for all intents and purposes, identical to the *Rales* standard." *DiRienzo* v. *Lichtenstein*, 2013 WL 5503034, at *29 (Del. Ch. Sept. 30, 2013). Thus, for the same reasons that Plaintiff's allegations do not pass the *Rales* test, they fail the first prong of the *Aronson* test.

Plaintiff maintains that demand is excused under the second prong of Aronson because the alleged misstatements that the Board supposedly approved violate the federal securities laws and thus fall outside the protection of the

-36-

business judgment rule. (Pl. Br. at 14, 20-25.) Plaintiff is wrong, both because he did not sufficiently allege that the Board acted in bad faith, and, as explained below, because the statements are not actionable in the first place.

To overcome the business judgment rule—that "directors are presumed to have acted on an informed basis and in the honest belief that their decisions were in furtherance of the best interests of the corporation and its shareholders," *Highland Legacy Ltd.* v. *Singer,* 2006 WL 741939 (Del. Ch. Mar. 17, 2006)—Plaintiff bears "a heavy burden," *Protas* v. *Cavanagh*, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012). "[T]his prong of the *Aronson* test is reserved for extreme cases in which, despite the appearance of independence and disinterest, a decision is so extreme or curious that it raises a legitimate ground to justify further inquiry and judicial review." *Strong* v. *Taylor*, 877 F. Supp. 2d 433, 450 (E.D. La. 2012) (applying Delaware law) (internal quotation marks omitted).

To overcome this presumption, Plaintiff must make particularized allegations raising a reasonable doubt that "the action was taken honestly and in good faith" or that "the board was adequately informed in making the decision." *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003). "[A] failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." *Strong*, 877 F. Supp. 2d at 450.

Here, even assuming that Goldman Sachs' general statements about its compliance with law and its conflicts controls are actionable, the Complaint did not come close to overcoming the presumptions of the business judgment rule for the same reasons that it did not establish a substantial likelihood of director liability for Plaintiff's claims. Plaintiff cannot show that the Board was aware of the alleged misconduct that supposedly rendered the Firm's general statements false and misleading, much less that the Board acted in bad faith. *See Strong*, 877 F. Supp. 2d at 451 (plaintiff must demonstrate both that laws were violated and that directors "were acting with the intent to violate th[o]se laws" to overcome the business judgment rule). As the District Court held, the Complaint failed to allege with particularity that a majority of the Board "acted in bad faith in whatever role they may have played in the issuance of the alleged misstatements." (A163.)

Nor can Plaintiff allege, in light of the size and scope of the Firm's business and the Firm's concededly robust reporting structure (*see supra* at 28) that the Board failed to remain adequately informed about three transactions among many thousands. "'[C]onscious disregard involves an intentional dereliction of duty which is more culpable than simple inattention or failure to be informed of all facts material to the decision.'" *Strong*, 877 F. Supp. 2d at 451 (citing *Goldman Sachs*, 2011 WL 4826104). Although directors must consider "material facts that are reasonably available" in exercising their business judgment, they need not

-38-

consider those facts "that are immaterial or out of the Board's reasonable reach," and their decision-making process will be actionable only "if grossly negligent." *Brehm*, 746 A.2d at 259 (emphasis omitted). The Complaint made no such allegations, particularized or otherwise.

In sum, as the District Court held, this Court should affirm because Plaintiff did not plead particularized facts sufficient to excuse his failure to make a demand on the Goldman Sachs Board before bringing this derivative action.

## II. UNDER GOVERNING SECOND CIRCUIT LAW, THE ALLEGED MISSTATEMENTS ON WHICH PLAINTIFF PREDICATES HIS DERIVATIVE CLAIMS ARE NOT ACTIONABLE.

In addition to Plaintiff's failure to plead sufficient facts excusing his failure to make a demand on the Goldman Sachs Board, this Court can—and should—affirm on the additional, independent basis that the challenged statements are not actionable, and, therefore, the Complaint failed to state a claim or present any likelihood of director liability for purposes of excusing demand.

This Court's decisions in *JP Morgan*, *UBS*, *Barclays*, *Boca Raton* and *Boca Raton II* make clear that neither Goldman Sachs nor any of its Board members can be liable for the Firm's general statements about its compliance with law or its conflicts of interest controls. Nevertheless, the District Court erroneously ruled below (and in the related putative securities fraud class action

against Goldman Sachs, *see Richman,* 868 F. Supp. 2d at 277-80), that such statements were actionable.

As the Court held in *UBS*, "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" 752 F.3d at 183. This Court explained that even an alleged misstatement that is "knowingly and verifiably false when made," must still "be *sufficiently specific* for an investor to reasonably rely on that statement as a *guarantee of some concrete fact or outcome*." *Id.* at 183, 185 (emphasis added).

As shown below, Goldman Sachs' general statements about its efforts to comply with the law and its other business principles are indistinguishable from the statements that this Court held in *JP Morgan*, *UBS, Boca Raton* and *Barclays* and *JP Morgan* were immaterial as a matter of law:[17]

| Challenged Goldman Sachs' Statements | Statements in *JP Morgan*, *UBS*, *Boca Raton* and *Barclays* |
|---|---|
| "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us." | UBS goes "above and beyond what laws and regulations require" (*UBS*). UBS "aim[s] to maintain the highest ethical standards in all our business dealings" (*UBS*). |

---

[17]    A more detailed comparison of the relevant statements is set forth in Addendum A hereto.

-40-

| | |
|---|---|
| "Integrity and honesty are at the heart of our business." <br><br> "Our reputation is one of our most important assets." | "[P]reserving UBS's integrity is vital to its most valuable asset—its reputation" (*UBS*). <br><br> "The integrity, reliability and credibility of S&P has enabled us to compete successfully in an increasingly global and complex market . . . " (*Boca Raton*). <br><br> "'[We] set the standard' for 'integrity' . . . " (*JP Morgan*). |
| "Our clients' interests always come first." | UBS "put[s] the clients at the center of all we do . . . " (*UBS*). <br><br> "We are focused on [] supporting our . . . customers . . . " (*Barclays*). |

This Court held in each of these cases that such aspirational statements were not "sufficiently specific" to pass its test of materiality. In *Boca Raton*, the Court held that "no reasonable purchaser of . . . stock would view statements" about a company's integrity and credibility "as meaningfully altering the mix of available information about the company." 506 F. App'x at 37; *see also Boca Raton II*, 2014 WL 4391912, at *2 ("generic, indefinite" statements not actionable) (internal quotation marks omitted). Similarly, this Court affirmed in relevant part Judge Scheindlin's holding that a company's statements about doing business ethically "fall squarely within the Second Circuit's definition of non-actionable puffery." *Barclays*, 944 F. Supp. 2d at 279. Most recently, this Court held in *UBS* that a company's statements that it "complie[s] with all applicable laws" are "'too general to cause a reasonable investor to rely upon them.'" 752

F.3d at 182-83 (quoting *JP Morgan*, 553 F.3d at 206). These decisions make clear that Goldman Sachs' virtually identical statements about its dedication to compliance with law, integrity and other business principles are likewise inactionable.

This Court's recent decisions also make clear that Goldman Sachs' general statements about its conflict of interest controls are inactionable. Those statements are at least as general as UBS's representations emphasizing its investment risk controls—*e.g.*, that UBS has established a "comprehensive set of risk factor limits," and "[one] of [UBS's] overriding risk management goals is the avoidance of concentration risks." Joint Appendix 318, 95, *UBS*, 752 F.3d 173 (2d Cir. 2014) (No. 12-4355). The *UBS* plaintiffs alleged that the bank used such statements to lull investors into believing that UBS, unlike other financial institutions, was conservative and avoided concentrated exposures to risky subprime assets. *Id.* at ¶ 44. Plaintiffs further alleged that UBS made these representations knowing that the bank had "neither established and/or maintained risk concentration controls," when the bank was secretly accumulating $100 billion in over-valued mortgage securities. *Id.* at 384, 393. Then, as UBS allegedly began to suffer undisclosed losses on these assets, the *UBS* plaintiffs claimed that UBS's senior executives continued to promote the bank's supposedly conservative investment risk controls to try to minimize the extent of its subprime exposure. *Id.*

at 372-73, 382, 384. Despite the plaintiffs' allegations that UBS's statements—many of which were made in the context of discussing the bank's subprime positions and in response to direct inquiries about its exposure to risky subprime assets—directly contradicted UBS's simultaneous and aggressive accumulation of high-risk, overvalued mortgage securities, this Court held that a reasonable investor could not view UBS's general representations about its risk controls as "guarantee[s]" that the bank would not acquire such positions. *UBS*, 752 F.3d at 185-86.[18]

As in *UBS, Boca Raton* and *Boca Raton II*, Goldman Sachs' general statements about its controls "designed to address" conflicts—which do not

---

[18] Similarly, in *Boca Raton*, the plaintiff shareholders alleged that McGraw-Hill—the publicly traded parent company of credit rating agency Standard & Poor's ("S&P")—repeatedly emphasized that it had "institutional safeguards in place to ensure the independence and integrity of [ratings] opinions." Joint Appendix at 253, *Boca Raton*, 506 F. App'x 32. Like the *UBS* plaintiffs, the *Boca Raton* plaintiffs further alleged that despite these unequivocal assurances, McGraw-Hill knew that S&P's "ratings method was basically a sham" and its processes lacked both independence and transparency. 506 F. App'x at 34. Nonetheless, this Court upheld Judge Stein's dismissal of those claims, holding that the challenged statements were too general to be actionable. *Id.* at 37. Even more recently, in *Boca Raton II*, this Court upheld Judge Stein's denial of plaintiffs' motion to replead their claims to add more detailed allegations about the manner in which S&P's alleged conduct was purportedly inconsistent with its statements about its ratings processes and controls. The Court reiterated that "these statements are too general to cause a reasonable investor to rely upon them as a guarantee that ratings would not be made without regard to profits, market share, or client feedback." *Boca Raton II*, 2014 WL 4391912, at *2.

reference any particular transaction, type of transaction or even line of business—
are not "sufficiently specific" to be actionable, notwithstanding the alleged
inconsistency between those statements and alleged undisclosed conflicts in the
three CDOs.  Rather, a reasonable investor would view Goldman Sachs' statements
as general descriptions of what its conflicts procedures were "designed to" do, not
as a guarantee that those procedures would avoid conflicts in *all* of the many
thousands of transactions in which Goldman Sachs engaged on a weekly basis.
This is particularly so when Goldman Sachs, unlike *UBS*, did not make its
disclosures in response to investor questions about its handling of specific conflicts
(or even conflicts in the mortgage area generally), and expressly warned
shareholders in the very filings Plaintiff identifies as misleading that conflicts were
*"increasing*," that "*dealing with conflicts of interest is complex and difficult*," that
"potential or perceived *conflicts could give rise to litigation or regulatory
enforcement actions*," and that its procedures to control conflicts could *"fail."*
(SA367; *see also* 410, 449-50, 487, 523) (emphasis added).[19]

---

[19]     The District Court's conclusion in *Richman* that the same general statements
by Goldman Sachs about its business principles and conflict controls are
actionable—relying in part on a pre-*JP Morgan* district court decision denying
Goldman Sachs' motion to dismiss an action based on many of the same
statements that were allegedly inconsistent with the Firm's management of
conflicts between investment banking and research, *Lapin* v. *Goldman Sachs Grp.,
Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006)—simply cannot be reconciled with this
Court's clear holdings that such statements are immaterial as a matter of law.  In
                                                         (footnote continued)

-44-

The inactionable nature of the challenged statements has two implications for this appeal. *First*, because none of the directors ever faced any likelihood of personal liability, demand was not excused. *Second*, because the allegations do not state a claim on the merits, the Complaint should have been dismissed outright. This Court should put any doubt to rest by affirming the dismissal of this action on that ground as well.

---

(footnote continued)

denying Goldman Sachs' recent motion for reconsideration in *Richman*, the District Court held that *UBS* and the Second Circuit's other recent decisions are distinguishable because, supposedly unlike the statements at issue in those cases, "Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct." *Goldman Sachs Sec. Litig.*, 2014 WL 2815571, at *5. But UBS's statements about its risk controls and avoidance of asset concentrations were even more at odds with UBS's concentrated subprime exposure than Goldman Sachs' statements that it had "controls designed to address conflicts of interest" were at odds with the Firm's alleged conduct in the three CDOs, which, unlike in *UBS*, were never the subject of the Firm's disclosures or investor inquiries. (*See supra* at 42-43.) The District Court also reasoned that UBS's statements were not "guarantee[s]" of any specific outcome, but nor were Goldman Sachs' statements challenged here (the District Court offered no explanation of how Goldman Sachs' statements *were* guarantees). *See Goldman Sachs Sec. Litig.*, 2014 WL 2815571, at *5. Defendants have filed a motion for certification of the District Court's decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That motion remains pending.

## CONCLUSION

For the foregoing reasons, the District Court's dismissal of Plaintiff's

Complaint should be affirmed.

Respectfully submitted,


/s Richard H. Klapper
Theodore Edelman
Robert J. Giuffra Jr.
David M.J. Rein
Benjamin R. Walker
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendants-Appellees*

September 15, 2014

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)(C)**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel for Defendants-Appellees hereby certifies that this brief complies with the type-volume limitations of Rule 32(a)(7)(B).   As measured by the word processing system used to prepare this brief, there are 13,246 words in this brief, including Addendum A.

/s/  Richard H. Klapper
Richard H. Klapper

Dated:  September 15, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September 2014 I caused the foregoing Brief for Defendants-Appellees to be served via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1. All counsel of record are registered CM/ECF users.

Six hard copies of the foregoing Brief for Defendants-Appellees were sent to the Clerk's Office by Hand Delivery to:

> Clerk of Court
> United States Court of Appeals, Second Circuit
> United States Courthouse
> 500 Pearl Street, 3rd Floor
> New York, New York 10007
> (212) 857-8576

> /s/  Jessica P. Stokes
> Jessica P. Stokes

**ADDENDUM**

**Addendum A**

| Alleged Misstatements in This Action | Alleged Misstatements Held Inactionable in *UBS*,[1] *Barclays*,[2] *Boca Raton*,[3] and *JP Morgan*[4] |
|---|---|
| "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard." (Appendix ("A") 57, 64 (emphasis omitted).) | "We . . . aim to maintain the highest ethical standards in all our business dealings. All employees, but in particular those involved in risk decisions, must make UBS's reputation an overriding concern. Responsibility for our reputation cannot be delegated or syndicated." (Joint Appendix 316, *UBS*, 752 F.3d 173 (2d Cir. 2014) (No. 12-4355) ("*UBS* JA") (emphasis omitted).) |
| "Integrity and honesty are at the heart of our business." (A57, 64 (emphasis omitted).) | UBS "strives to maintain . . . compliance with relevant regulations." (*UBS* JA615.) |
| "Our reputation is one of our most important assets." (A56.) | "[L]ong-term value creation is . . . dependent on what [UBS] does above and beyond what laws and regulations require." (*UBS* JA615.) |
| "Our assets are our people, capital and reputation. If any of these is ever diminished, the last is the most difficult to restore." (A57.) | "The firm and its employees should conduct themselves in a manner that is above reproach, as preserving UBS's integrity is vital to its most valuable asset – its reputation." (*UBS* JA615.) |
| | "Our reputation is critical in maintaining our relationships with clients, investors, regulators and the general public." (*UBS* JA614.) |
| | "[T]he principles that guide Barclays business" include "acting |

---

[1] *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("*UBS*").

[2] *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) ("*Barclays*").

[3] *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012) ("*Boca Raton*").

[4] *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ("*JP Morgan*").

| Alleged Misstatements in This Action | Alleged Misstatements Held Inactionable in *UBS*,[1] *Barclays*,[2] *Boca Raton*,[3] and *JP Morgan*[4] |
|---|---|
| | with the highest levels of integrity to retain the trust of customers, shareholders, other external stakeholders and colleagues," and "complying with relevant legal and regulatory requirements." (Joint Appendix 66, *Barclays*, 750 F.3d 227 (2d Cir. 2014) (No. 13-2678) ("*Barclays JA*"); *see also id.* at 59, 63-64 (emphasis omitted).) |
| | "[T]he heart of our strategy [is] . . . making informed, reasoned and ethical decisions in our business dealings with customers, clients, employees and our other stakeholders." (*Barclays JA42* (emphasis omitted).) |
| | "The integrity, reliability and credibility of S&P has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are confident it will be so in the future." (Joint Appendix 191-92, *Boca Raton*, 506 F. App'x 32 (2d Cir. 2012) (No. 12-1776) ("*Boca Raton JA*"); *see also id.* at 181 (emphasis omitted).) |
| | "Standard and Poor's, on the rating side, is a trusted business. It's a reputation business." (*Boca Raton* JA213) (emphasis omitted). |
| | "[We] 'set the standard' for 'integrity'" (Compl. ¶ 3, *JP Morgan*, 553 F.3d 187 (2d Cir. 2009) (No. 07-1786) ("*JP Morgan* Compl.").) |
| "Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow." (A57 (emphasis omitted).) | UBS "put[s] the clients at the center of all we do, with a clear determination to reinforce our client interfaces and be in a permanent, open and constructive dialogue with all of our clients." (*UBS* JA421-22; *see also id.* at 335-36, 611-12.) |
| "Most importantly, and [the] basic reason for our success, is our extraordinary focus on our clients." (A57.) | Barclays "support[s] our customers and clients, and the communities in which we operate. . . ." (*Barclays* JA61 |

| Alleged Misstatements in This Action | Alleged Misstatements Held Inactionable in *UBS*,[1] *Barclays*,[2] *Boca Raton*,[3] and *JP Morgan*[4] |
|---|---|
| | (emphasis omitted).) |
| "We have extensive procedures and controls that are designed to . . . address conflicts of interest . . . ." (A56 (emphasis omitted).) | "Our role is to help improve the lives of our customers." (*Barclays* JA71.) |
| "[W]e increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client . . . ." (A56 (emphasis omitted).) | UBS's "operational risk management and control systems and processes are designed to ensure that the risks associated with our activities . . . are appropriately controlled" (*UBS* JA612-13; *see also id.* at 616-17.) |
| | One of UBS's "overriding risk management goals is the avoidance of concentration risks." (*UBS* JA95, 297-98 (emphasis omitted).) |
| "Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses. . . . [A]ppropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest." (A56 (emphasis omitted).) | UBS "protect[s] [its] reputation by managing and controlling the risks incurred in the course of [its] business, and for this reason [it] avoid[s] concentrations of exposure[,]" (*UBS* JA95 (emphasis omitted).) |
| | UBS has established "a comprehensive set of risk factor limits." (*UBS* JA318.) |
| | "The diversification of risks and avoidance of undue concentrations remain key pillars of our risk control process." (*UBS* JA346 (emphasis omitted).) |
| | UBS "ha[s] grown [its] business without compromising any of the risk disciplines that are the foundation of prudent management." (*UBS* JA95.) |
| | Barclays' "Code of Ethics . . . embodies the commitment of Barclays . . . to promote: . . . [h]onest and ethical conduct, including the ethical handling of actual or apparent conflicts of |

| Alleged Misstatements in This Action | Alleged Misstatements Held Inactionable in *UBS*,[1] *Barclays*,[2] *Boca Raton*,[3] and *JP Morgan*[4] |
|---|---|
| | interest between personal and professional relationships." (*Barclays* JA83 (emphasis added).) |
| | "Barclays operates within a robust system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage." (*Barclays* JA73; *see also id.* at 42, 49, 51, 72 (emphasis omitted).) |
| | S&P "endeavors to . . . ensure[] that the integrity and independence of [the ratings process] are not compromised by conflicts of interest, abuse of confidential information or other undue influence.'" (*Boca Raton* JA278.) |
| | "We have institutional safeguards in place to ensure the independence and integrity of [ratings] opinions.'" (*Boca Raton* JA253 (emphasis omitted).) |
| | S&P's code of practices and procedures "underscores our own dedication towards transparent and independent decision-making process.'" (*Boca Raton* JA136 (emphasis omitted).) |
| | JP Morgan has "risk management processes [that] are highly disciplined and designed to preserve the independence and integrity of the risk assessment process . . . ." (*JP Morgan* Compl. ¶¶ 270, 271 (emphasis omitted).) |

-4-